IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

PENNY ANN WEST,
*Appellant*.

No. 2 CA-CR 2013-0562
Filed November 13, 2015

---

Appeal from the Superior Court in Pima County
No. CR20063310
The Honorable John S. Leonardo, Judge
The Honorable Javier Chon-Lopez, Judge

**AFFIRMED**

---

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By David A. Sullivan, Assistant Attorney General, Tucson
*Counsel for Appellee*

Law Offices of Thomas Jacobs, Tucson
By Thomas Jacobs
*Counsel for Appellant*

## OPINION

Presiding Judge Vásquez authored the opinion of the Court, in which Judge Howard and Judge Kelly[1] concurred.

V Á S Q U E Z, Presiding Judge:

¶1        After a jury trial, Penny West was convicted of criminally negligent child abuse under circumstances likely to produce death or serious physical injury. The trial court suspended the imposition of sentence and placed her on probation for a period of three years, ordering that she serve a six-month jail term as a condition of probation. Penny contends the court erred by denying her motion for a new trial on the following grounds: (1) the state presented four alternate theories of criminal liability that deprived her of a unanimous verdict; (2) the court erred in denying her request for a unanimous-verdict jury instruction; (3) the verdict was against the weight of the evidence; and (4) the prosecutor committed misconduct during trial and closing argument. We affirm.

## Factual and Procedural Background

¶2        The procedural history of this case is extensive. We view the underlying facts in the light most favorable to sustaining Penny's conviction. *See State v. Brown*, 233 Ariz. 153, ¶ 2, 310 P.3d 29, 32 (App. 2013). On August 24, 2005, sixteen-month-old Emily M. died from severe head trauma. At the time, she was a foster child in the care of Penny and her husband Randall.[2] We set forth only the relevant facts necessary to resolve this appeal.

---

[1]The Hon. Virginia C. Kelly, a retired judge of this court, is called back to active duty to serve on this case pursuant to orders of this court and our supreme court.

[2]Penny and Randall have three children—M., K., and C.—and were also caring for two other foster children—D. and K.M.—at the time. Emily and K.M. were sisters.

¶3        Penny was the only adult at home that morning when she claimed Emily fell over backward on the carpeted floor.  Penny took Emily to the bathroom, removed her clothing, and splashed water on her in an attempt to revive her.  After Emily did not respond, Penny called Randall and then 9-1-1.  That was the ninth telephone call exchanged between Penny and Randall in less than an hour.[3]  Emily was unconscious when she was transported to the hospital.  A neurosurgeon performed emergency brain surgery, but Emily died shortly thereafter.  The county medical examiner concluded that Emily's death was due to one or more "blunt impacts to the head with subdural hemorrhage."

¶4        A grand jury indicted Penny and Randall for intentional or knowing child abuse likely to produce death or serious physical injury in violation of A.R.S. § 13-3623(A).  The amended indictment alleged that Penny and Randall,

> having the care or custody of Emily . . . ,
> committed child abuse by intentionally or
> knowingly causing physical injury to Emily
> . . . , or causing or permitting the person or
> health of Emily . . . to be injured, or causing
> or permitting Emily . . . to be placed in a
> situation    where    her    health    was
> endangered.

¶5        During trial, Penny and Randall filed a motion to compel the state "to elect one single act or 'transaction' on which it seeks to have the jury convict each Defendant."  Alternatively, they requested that the trial court give a jury instruction requiring unanimity as to the "same act or omission" constituting child abuse.  In response, the state argued that § 13-3623(A) provides three ways

---

[3]One call was made so Penny could settle a bet between Randall and M., but the content of the others was undisclosed. Evidence that the other calls had been placed was admitted at trial, but the court prohibited the state from speculating about their substance.

to commit child abuse, it did not have to elect one of those ways on which to proceed, and the court should instruct the jury that it did not have to unanimously agree on the way the offense was committed so long as all the jurors found one of the ways proven. The court agreed with the state and denied the requests.

¶6　　　　　During closing argument, the state asserted that "all three ways of committing child abuse were done in this case." The trial court instructed the jury: "[I]t is not necessary that all eight of you agree on the particular manner in which the crime was committed. However, it is necessary that each of you determine that the defendant committed child abuse in at least one of the three possible manners charged." The jury found Penny guilty of criminally negligent child abuse under circumstances likely to produce death or serious injury and found Randall guilty of reckless child abuse under circumstances not likely to produce death or serious injury.

¶7　　　　　After trial, Penny and Randall separately filed motions for judgments of acquittal, pursuant to Rule 20, Ariz. R. Crim. P., arguing there was insufficient evidence to support their convictions. They also filed a joint motion for a new trial. After hearing oral argument, the trial court granted their motions for judgments of acquittal, concluding that "a rational trier of fact could find beyond a reasonable doubt that [Emily's] injury was caused by an act of child abuse" but there was insufficient evidence to show which of them had committed that act. The state appealed.

¶8　　　　　Reviewing the trial court's Rule 20 determination for an abuse of discretion, this court reversed. *State v. West*, 224 Ariz. 575, ¶¶ 8, 15, 233 P.3d 1154, 1156, 1158 (App. 2010) (*West I*). However, on review, our supreme court clarified that the "question of sufficiency of the evidence is one of law, subject to de novo review on appeal." *State v. West*, 226 Ariz. 559, ¶ 15, 250 P.3d 1188, 1191 (2011) (*West II*). The court thus vacated our opinion and remanded the case to this court to address the merits of the state's appeal. *Id.* ¶ 20.

¶9　　　　　On remand, we concluded there was sufficient evidence to support Penny's conviction. *State v. West*, No. 2 CA-CR 2008-

4

0342, ¶ 14 (memorandum decision filed Mar. 5, 2012) (*West III*). We explained that the state needed to present substantial evidence "under any of [the] three alternate theories" of § 13-3623(A). *Id.* ¶ 13. Turning to the first means of violating § 13-3623(A), we explained that Penny "was the only adult in the house when Emily collapsed" and "virtually every doctor involved in Emily's emergency care testified she would not have suffered her severe head injury from the standing-height fall Penny had described." *Id.* ¶ 15. Citing testimony from the state's experts, we pointed out that "Emily's head injury had occurred 'recently,' 'that morning . . . or maybe the evening before,' and that she would have displayed symptoms immediately afterward." *Id.* ¶ 17 (alteration in *West III*). We also highlighted the inconsistencies in Penny's account of the injury. *Id.* ¶ 16. We thus concluded that "there was 'such proof that reasonable persons could accept as adequate and sufficient to support a conclusion [that Penny caused or permitted Emily's injury,] beyond a reasonable doubt.'" *Id.* ¶ 19, *quoting West II*, 226 Ariz. 559, ¶ 16, 250 P.3d at 1191 (alteration in *West III*). And, consequently, we did not address the other means of committing child abuse under § 13-3623(A). *Id.*

¶10 However, we did not reach the same conclusion as to Randall. *Id.* ¶ 20. We found the evidence "too speculative to constitute substantial evidence that Randall, either alone or in concert with Penny, injured Emily" under the first means in § 13-3623(A). *Id.* Because the state conceded "there was insufficient evidence to support Randall's conviction under the second means of violating" § 13-3623(A), we turned to the third. *Id.* ¶ 24. We declined to rely on the telephone calls between Penny and Randall as evidence that he had delayed in seeking medical care for Emily because the content of those calls was not contained in the record. *Id.* ¶ 25. We also explained, "When the state alleges that a caretaker has endangered a child by failing to obtain prompt medical treatment for the child's injuries, the state must prove the delay increased the child's risk of harm." *Id.* ¶ 26. And because the state presented no such evidence, we concluded that "there was insufficient evidence to support Randall's conviction under the third means of violating § 13-3623." *Id.* Accordingly, we affirmed the trial

court's order granting Randall's Rule 20 motion but reversed it as to Penny. *Id.* ¶ 27.

**¶11** After our supreme court denied Penny's petition for review, the case returned to the trial court, where Penny renewed and supplemented her motion for a new trial, which the court had originally declined to address after granting her motion for judgment of acquittal. After hearing oral argument, the court denied Penny's motion and subsequently sentenced her as described above.[4] This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## Jury Unanimity

**¶12** Penny contends the trial court erred by denying her motion for a new trial based on a lack of jury unanimity in reaching the verdict.[5] Specifically, she asserts the state argued alternate theories of criminal liability but substantial evidence did not support all the theories. Generally, we review the denial of a motion for a new trial for an abuse of discretion. *State v. Hoskins*, 199 Ariz. 127, ¶ 52, 14 P.3d 997, 1012 (2000). However, we review questions of law, including constitutional issues, de novo. *State v. Bolding*, 227 Ariz. 82, ¶ 5, 253 P.3d 279, 282 (App. 2011).

---

[4] The trial court originally imposed a term of four years' probation, including six months' incarceration. Penny petitioned this court for special-action review, however, arguing that the court erred in requiring her to serve six months in jail "based on [her] failure to admit responsibility and express remorse." We accepted jurisdiction and granted relief, vacating the sentencing order and directing the court to resentence Penny. *West v. Chon-Lopez*, No. 2 CA-SA 2013-0089 (decision order filed Nov. 8, 2013).

[5] Although Penny argues the lack of jury unanimity "creat[ed] a due process violation," she does not develop the argument in any meaningful way. We therefore do not address it. *See* Ariz. R. Crim. P. 31.13(c)(1)(vi); *State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

¶13 A criminal defendant has the constitutional right to a unanimous jury verdict. Ariz. Const. art. II, § 23; *see also State v. Payne*, 233 Ariz. 484, ¶ 81, 314 P.3d 1239, 1263 (2013). The jury therefore must be unanimous "'on whether the criminal act charged has been committed.'" *State v. Herrera*, 176 Ariz. 9, 16, 859 P.2d 119, 126 (1993), *quoting State v. Encinas*, 132 Ariz. 493, 496-97, 647 P.2d 624, 627-28 (1982). However, "'the defendant is not entitled to a unanimous verdict on the precise manner in which the act was committed.'" *Id.*, *quoting Encinas*, 132 Ariz. at 496-97, 647 P.2d at 627-28; *see also State v. Dann*, 220 Ariz. 351, ¶ 79, 207 P.3d 604, 620 (2009) ("Jurors may . . . reach a verdict based on a combination of alternative findings.").

¶14 A person commits child abuse when he or she,

> [u]nder circumstances likely to produce death or serious physical injury, . . . causes a child . . . to suffer physical injury or, having the care or custody of a child . . . , causes or permits the person or health of the child . . . to be injured or . . . causes or permits a child . . . to be placed in a situation where the person or health of the child . . . is endangered.

§ 13-3623(A). "[T]he statute increases the offense level based on the actor's intent: If the offense is 'done intentionally or knowingly,' it becomes a class 2 felony." *Payne*, 233 Ariz. 484, ¶ 71, 314 P.3d at 1261, *quoting* § 13-3623(A)(1). "It is a lesser offense if done negligently or recklessly." *Id.*; *see* § 13-3623(A)(2), (3).

¶15 In *State v. Forrester*, 134 Ariz. 444, 447, 657 P.2d 432, 435 (App. 1982), we explained, "If a statute describes a single offense which may be committed in more than one way, it is unnecessary for there to be unanimity as to the means by which the crime is committed provided there is substantial evidence to support each of the means charged." There, the statute at issue was A.R.S. § 13-1802 governing theft. *Id.* at 446-47, 657 P.2d at 434-35. The defendant was indicted with theft by controlling the property of another with the

intent to deprive the other of that property, *see* § 13-1802(A)(1), or converting property entrusted to him for an unauthorized term or use, *see* § 13-1802(A)(2). *Forrester*, 134 Ariz. at 447, 657 P.2d at 435. The trial court instructed the jury that it could find the defendant guilty by either means. *Id.* On appeal, the defendant argued the court "erred by failing to require the jury to specify under what theory it found him guilty." *Id.* We rejected that argument after determining the theft statute described a single offense capable of being committed in various ways and did not require jury unanimity on the way it was committed. *Id.* at 447-48, 657 P.2d at 435-36.

**¶16** In her motion for a new trial, Penny relied on *Forrester* and argued § 13-3623(A) is an "alternative means" statute requiring substantial evidence to support each of the means charged. She maintained, however,

> substantial evidence was lacking to prove that [she] committed child abuse by either the second or third of the statutorily-described means, or both—that is, by "caus[ing] or permit[ting] the person or health of the person to be injured," and/or by "caus[ing] or permit[ting] a child . . . to be placed in a situation where the person or health of the child . . . is endangered."

In her supplemental brief on her motion, Penny relied on this court's determination that substantial evidence did not support Randall's conviction under the third means of the statute and maintained that the same reasoning applied to her. *See West III*, No. 2 CA-CR 2008-0342, ¶ 26. At oral argument on her motion for a new trial, Penny further asserted the state presented a "buffet of factual options" for the jury to choose from, suggesting that there needed to be substantial evidence for each of the state's factual theories.

**¶17** The trial court rejected Penny's argument. It noted that it was bound by this court's determination that substantial evidence supported Penny's conviction under the first means of committing

child abuse in § 13-3623(A)—that Penny had caused Emily's injury. *See West III*, No. 2 CA-CR 2008-0342, ¶¶ 14, 19. And, it reasoned,

> because substantial evidence existed to find [Penny] personally injured Emily in the morning while she was in [Penny's] care, the jury also necessarily had substantial evidence before it to find that [Penny] caused or permitted Emily's person or health to be injured and that [Penny] permitted Emily to be placed in a situation where her person or health was endangered.

The court also concluded that its analysis focused on the substantial evidence to support "each alternative means," not the state's factual theories.

¶18        On appeal, Penny repeats her argument but seems to focus on the state's specific factual theories to prove the means charged rather than the statutory means charged. She contends "the state argued four alternate theories of criminal liability": (1) "Penny personally caused Emily's head injury"; (2) "Randall personally caused Emily's injury, but Penny culpably left Emily alone with him"; (3) "regardless of the genesis of Emily's injury," Penny delayed calling 9-1-1 "in a joint criminal act with Randall . . . while the two exchanged phone calls"; or (4) "regardless of the genesis of Emily's injury," Penny personally delayed calling 9-1-1 "while she stripped and splashed Emily, and then called Randall." And, she maintains "there was no substantial evidence to support three of the four theories."

¶19        Penny and the state apparently agree that § 13-3623(A) is an alternative-means statute. "Alternative means statutes identify a single crime and provide more than one means of committing the crime." *In re Det. of Halgren*, 132 P.3d 714, 720 (Wash. 2006); *see also State v. Brown*, 284 P.3d 977, 985 (Kan. 2012). In Arizona, we use the term "single unified offense" to describe a crime proscribed by an alternative-means statute. *State v. Garcia*, 235 Ariz. 627, ¶ 8, 334 P.3d

1286, 1289 (App. 2014). We agree that § 13-3623(A) is an alternative-means statute and that child abuse under the statute is a single unified offense.

**¶20** In determining whether a statute provides alternative means of committing the same offense, we must "ascertain and give effect to the intent of our legislature." *State v. Garcia*, 219 Ariz. 104, ¶ 6, 193 P.3d 798, 800 (App. 2008); *see also State v. Manzanedo*, 210 Ariz. 292, ¶ 8, 110 P.3d 1026, 1028 (App. 2005). In conducting this analysis, we may consider: "(1) the title of the statute, (2) whether there was 'a readily perceivable connection between the various acts' listed in the statute, (3) whether those acts were 'consistent with and not repugnant to each other,' and (4) whether those acts might 'inhere in the same transaction.'" *Manzanedo*, 210 Ariz. 292, ¶ 8, 110 P.3d at 1028, *quoting State v. Dixon*, 127 Ariz. 554, 561, 622 P.2d 501, 508 (App. 1980). The plain language of a statute is the best and most reliable indicator of the legislature's intent. *State v. Christian*, 202 Ariz. 462, ¶ 5, 47 P.3d 666, 667-68 (App. 2002). "'When a statute is clear and unambiguous, we apply its plain language and need not engage in any other means of statutory interpretation.'" *State v. Gongora*, 235 Ariz. 178, ¶ 5, 330 P.3d 368, 369 (App. 2014), *quoting State v. Arellano*, 213 Ariz. 474, ¶ 9, 143 P.3d 1015, 1018 (2006).

**¶21** The language of § 13-3623(A) is clear and unambiguous. The title, child abuse, "summarizes the statute as dealing with a single offense." *Forrester*, 134 Ariz. at 448, 657 P.2d at 436. Within the first paragraph, the statute plainly provides three ways—or means—of committing child abuse. They include: (1) causing a child to suffer a physical injury; (2) having the care or custody of a child, causing or permitting the person or health of the child to be injured; and (3) having the care or custody of a child, causing or permitting the child to be placed in a situation where the person or health of the child is endangered. § 13-3623(A). The three means are not repugnant to each other because proof of one "does not disprove the other." *Manzanedo*, 210 Ariz. 292, ¶ 9, 110 P.3d at 1028. Moreover, § 13-3623(A) "focuses on a single harm to the victim," and the three means "merely provide different ways of causing that single harm." *State v. Paredes-Solano*, 223 Ariz. 284, ¶ 14, 222 P.3d 900, 906 (App. 2009); *see also In re Jeremiah T.*, 212 Ariz. 30, ¶ 12, 126

P.3d 177, 181 (App. 2006). The child-abuse statute is therefore similar to the theft statute addressed in *Forrester*. *See Paredes-Solano*, 223 Ariz. 284, ¶ 14, 222 P.3d at 906 (theft statute focuses on single harm: "deprivation of control over one's property").

**¶22** We recognize that, in addition to providing the three means of committing child abuse, § 13-3623(A) also contains three subsections that classify the offense based on the defendant's mental state: intentional or knowing child abuse, reckless child abuse, and criminally negligent child abuse. *See State v. Freeney*, 223 Ariz. 110, ¶ 16, 219 P.3d 1039, 1042 (2009) (if elements of one offense differ from those of another, they are distinct and separate crimes); *Black's Law Dictionary* 634 (10th ed. 2014) (defining "elements of crime" as "constituent parts," usually including mens rea); *see also Brown*, 284 P.3d at 988 (in considering whether statute provides alternative means, court must ask if it lists "distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reas*, and, in some statutes, a causation element"). But regardless of which mental state is implicated, child abuse is still one offense that can be committed the same three ways. *Cf. State v. Valentini*, 231 Ariz. 579, ¶ 9, 299 P.3d 751, 754 (App. 2013) ("[S]econd-degree murder is one offense regardless of the culpable mental state with which it is committed."). The mental states are separate from the means, and the subsections merely "increase[] the offense level based on the actor's intent." *Payne*, 233 Ariz. 484, ¶ 71, 314 P.3d at 1261 (mens rea applies to act that defendant commits). We therefore conclude that § 13-3623(A) is an alternative-means statute, and child abuse is a single unified offense, the classification of which changes depending on the defendant's mental state.

**¶23** For the first time on appeal, Penny argues "there are fully eight different ways for a person to commit child abuse" under § 13-3623(A). She separates the three means in the statute by distinguishing between active and passive conduct and mental and physical injury. She claims that "causing" is active while "permitting" is passive, and "person" refers to a physical injury while "health" connotes a mental harm. But we are aware of no case law supporting this approach. *See Brown*, 284 P.3d at 992 ("[I]t is unlikely that the legislature intended for options within a means to

constitute alternative means . . . ."); *cf. Payne*, 233 Ariz. 484, ¶ 86, 314 P.3d at 1263 (describing "causing or permitting" injury as "discrete method of committing child abuse under § 13-3623(A)"). We thus treat the statute as providing three alternative means, as the parties and the trial court did below, and as we did in our memorandum decision in the prior appeal. *See West III*, No. 2 CA-CR 2008-0342, ¶¶ 13-14.

**¶24** Having determined that child abuse under § 13-3623(A) is a single offense that may be committed in three ways, we turn to Penny's *Forrester* argument.[6] As an initial matter, *Forrester* generally requires substantial evidence supporting "each of the means charged," not the state's factual theories of the case, as Penny seems to suggest. 134 Ariz. at 447, 657 P.2d at 435; *see also Dixon*, 127 Ariz. at 561, 622 P.2d at 508. This is consistent with due process, which "requires that a defendant be given 'notice of the specific charge'" but not the state's theory of the charge. *State v. Rivera*, 207 Ariz. 69, ¶ 12, 83 P.3d 69, 73 (App. 2004), *quoting State v. Blakley*, 204 Ariz. 429, ¶ 47, 65 P.3d 77, 87 (2003). However, with an alternative-means statute like § 13-3623(A), where the offense level is based on the defendant's mental state, and the jury is provided instructions on the lesser mental states, we must determine whether substantial evidence supports all three means involving the mental state for which the defendant was convicted. *See Brown*, 284 P.3d at 983 (requiring substantial evidence to support means "set out in the jury instructions"); *State v. Smith*, 154 P.3d 873, 875 (Wash. 2007) (requiring substantial evidence "of each of the relied-on alternative means").

---

[6]At oral argument, the state asserted for the first time that *Forrester* may no longer apply in light of *Griffin v. United States*, 502 U.S. 46, 47, 59-60 (1991), where the Supreme Court concluded that "a general guilty verdict on a multiple-object conspiracy [need not] be set aside if the evidence is inadequate to support conviction as to one of the objects." However, the parties did not brief this issue. We therefore do not address it. *See State v. Edmisten*, 220 Ariz. 517, ¶ 19, 207 P.3d 770, 776-77 (App. 2009) ("[A]rguments raised for the first time at oral argument are generally waived.").

**¶25**     Here, the indictment essentially mirrored the language of § 13-3623(A)(1), alleging that Penny had committed child abuse by "intentionally or knowingly causing physical injury to Emily . . . , or causing or permitting the person or health of Emily . . . to be injured, or causing or permitting Emily . . . to be placed in a situation where her health was endangered." Penny, however, was convicted of the lesser offense of criminally negligent child abuse under § 13-3623(A)(3). Substantial evidence supports each of the three means of that offense.

**¶26**     Our memorandum decision in *West III* is now law of the case. *See State v. Whelan*, 208 Ariz. 168, ¶ 8, 91 P.3d 1011, 1014 (App. 2004) ("'Law of the case concerns the practice of refusing to reopen questions previously decided in the same case by the same court or a higher appellate court.'"), *quoting Davis v. Davis*, 195 Ariz. 158, ¶ 13, 985 P.2d 643, 647 (App. 1999). We determined there was substantial evidence that Penny had caused Emily's injury under the first means of committing child abuse under § 13-3623(A). *West III*, No. 2 CA-CR 2008-0342, ¶¶ 14, 19. And we also noted that Emily was in Penny's care. *Id.* ¶¶ 15, 18. We agree with the trial court's determination that these two findings compel the conclusion that substantial evidence supports the other two means under § 13-3623(A). Because substantial evidence supports a finding that Penny "cause[d Emily] to suffer physical injury," there is also sufficient evidence that Penny "cause[d] or permit[ted] the person or health of [Emily] to be injured" and that Penny "cause[d] or permit[ted Emily] to be placed in a situation where [her] person or health . . . [wa]s endangered."[7]  § 13-3623(A). Indeed, Penny admits that

---

[7]At oral argument, Penny insisted that there was insufficient evidence to support the third means because the content of the telephone calls exchanged between Penny and Randall was unknown and the medical experts testified that the delay encompassed by those calls did not contribute to Emily's injury. However, Penny is conflating the means charged and the state's factual theories to prove those means. The issue is whether Penny "cause[d] or permit[ted Emily] to be placed in a situation where [her] person or health . . . [wa]s endangered." § 13-3623(A).

causing a child to suffer physical injury under the first means "is equivalent" to causing the person of the child to be injured under the second.

**¶27**        Penny nevertheless argues that we must "disaggregate the different means of commission argued, and then once disaggregated, . . . decide if sufficient evidence was presented to prove each disaggregated, alternative means."  As we understand her argument, she seems to suggest we must be able to identify distinct evidence that separately establishes each of the three means. But she does not appear to have raised this argument below, and she does not cite authority to support her argument on appeal; we therefore could deem the argument waived.  *See State v. Bolton*, 182 Ariz. 290, 297-98, 896 P.2d 830, 837-38 (1995) (argument not raised below generally waived for all but fundamental error on appeal; failure to sufficiently argue claim on appeal constitutes waiver).  In any event, we disagree.

**¶28**        Because child abuse under § 13-3623(A) is a single unified offense, the same evidence can be used to prove all three means.  *Cf. State v. Sustaita*, 119 Ariz. 583, 591, 583 P.2d 239, 247 (1978) ("We have stated that '. . . [a]n offense which requires different evidence or elements than the principal charge is a separate offense . . . .'"), *quoting State v. Woody*, 108 Ariz. 284, 287, 496 P.2d 584, 587 (1972) (first alteration in *Sustaita*).  Indeed, the connection between the means is a unique feature of alternative-means statutes. *See Manzanedo*, 210 Ariz. 292, ¶ 8, 110 P.3d at 1028 (considering "'readily perceivable connection'" between means and whether means "'inhere in the same transaction'"), *quoting Dixon*, 127 Ariz. at 561, 622 P.2d at 508.  For example, in *Forrester*, we recognized that the jury could not find the elements of § 13-1802(A)(2) "without necessarily finding . . . the elements" of § 13-1802(A)(1).  134 Ariz. at 448, 657 P.2d at 436.

---

Resolution of that issue is not solely dependent upon whether Penny's delay in calling 9-1-1 caused further injury.

**¶29**    Our supreme court's decision in *Payne* supports our conclusion. In that case, the defendant was charged with several offenses, including two counts of child abuse—one for each of his children—alleging he had "caused or permitted [their] health to be endangered by failing to seek medical attention for them or allowing them to starve to death." *Payne*, 233 Ariz. 484, ¶ 88, 314 P.3d at 1263. The defendant argued that the "counts were duplicitous because he could be found guilty based on two separate acts: failing to seek medical attention 'and/or' starving the children to death." *Id.* The court disagreed, however, because "each count of the indictment charge[d] only one crime of child abuse, essentially by neglect." *Id.* ¶ 90. It further reasoned that the counts were not duplicitous because the defendant "was not entitled to a unanimous verdict on the manner in which the act was performed." *Id.* And, the court concluded that, even assuming error had occurred, the defendant was not prejudiced because no reasonable jury could have found him not guilty of child abuse based on his failure to seek medical care. *Id.*

**¶30**    Similarly, although Penny was entitled to a unanimous jury verdict on whether she committed child abuse, she was not entitled to a unanimous jury verdict "'on the precise manner in which the act was committed.'" *Herrera*, 176 Ariz. at 16, 859 P.2d at 126, *quoting Encinas*, 132 Ariz. at 496, 647 P.2d at 627. And, consistent with *Forrester*, substantial evidence supports Penny's conviction based on all three means of § 13-3623(A). *See Forrester*, 134 Ariz. at 447, 657 P.2d at 435. The trial court therefore did not err by denying Penny's motion for a new trial based on a lack of jury unanimity. *See Hoskins*, 199 Ariz. 127, ¶ 52, 14 P.3d at 1012; *Bolding*, 227 Ariz. 82, ¶ 5, 253 P.3d at 282.

**Jury Instructions**

**¶31**    Penny also contends the trial court erred by denying her motion for a new trial based on *State v. Klokic*, 219 Ariz. 241, 196 P.3d 844 (App. 2008). Relying on *Klokic*, she argues the court should have provided a unanimity instruction to the jury or, alternatively, required the state to elect one theory of criminal liability on which to proceed. Again, we review the denial of a motion for a new trial for

an abuse of discretion, *Hoskins*, 199 Ariz. 127, ¶ 52, 14 P.3d at 1012, but we review questions of law de novo, *Bolding*, 227 Ariz. 82, ¶ 5, 253 P.3d at 282.

**¶32** In *Klokic*, the defendant was convicted of one count of aggravated assault stemming from a road-rage incident. 219 Ariz. 241, ¶¶ 1-2, 196 P.3d at 845. To prove that count, the state introduced evidence at trial that the defendant had pointed a gun at the victim on two separate occasions. *Id.* ¶ 6. The defendant asked the trial court to require the state "either to elect which particular act it was charging as the assault or to instruct the jurors that they must unanimously agree [on the] particular act that constituted the crime of assault." *Id.* ¶ 7. The court, however, refused. *Id.*

**¶33** On appeal, this court explained, "[I]f the State introduces evidence of multiple criminal acts to prove a single charge, the trial court is normally obliged to take one of two remedial measures to insure that the defendant receives a unanimous jury verdict": (1) require the state to elect which of the alleged acts constitutes the crime or (2) instruct the jury that they must unanimously agree on the act that constitutes the crime. *Id.* ¶ 14. However, we also pointed out that "it is not error for the trial court to fail to require such curative measures in those instances in which all the separate acts that the State intends to introduce into evidence are part of a single criminal transaction." *Id.* ¶ 15. We explained that "multiple acts may be considered part of the same criminal transaction 'when the defendant offers essentially the same defense to each of the acts and there is no reasonable basis for the jury to distinguish between them.'" *Id.* ¶ 18, *quoting People v. Stankewitz,* 793 P.2d 23, 41 (Cal. 1990). Under the facts of that case, we concluded the separate acts were not part of the same criminal transaction and, consequently, the trial court erred in refusing to provide one of the curative measures. *Id.* ¶ 38.

**¶34** In her motion for a new trial, Penny cited *Klokic*, asserting that the state had argued she committed child abuse by "any one o[f] several different acts." She thus maintained the trial court should have taken one of the two curative measures outlined

in *Klokic* but failed to do so. She further asserted that this case did not involve a single criminal transaction.

**¶35** The trial court rejected Penny's *Klokic* argument, finding that "the acts in this case [were a] single criminal transaction" and, consequently, "neither election nor a unanimity instruction was required." The court reasoned that Penny and Randall had "offered one unified defense to the child abuse charge"—they "both asserted that they did not injure Emily while she was in their care, either the night before or the morning of Emily's tragic injury." Thus, according to the court, "the jury was left with only one issue: was [Penny] responsible for Emily's injury as the State charged or was someone else responsible for her injury as [Penny] asserted." Based on the verdict, the court concluded that the jury did not believe Penny's defense. The court further noted that, "in child abuse cases in California, a unanimity instruction is not required where . . . the offense itself consists of a continuous course of conduct." *See People v. Diedrich*, 643 P.2d 971, 980-81 (Cal. 1982). It then concluded, "Even if this case were not a single transaction case, it is without question a continuous course of conduct child abuse case and no unanimity instruction was required."

**¶36** Penny repeats her *Klokic* argument on appeal. In particular, she disputes the trial court's conclusion that this was a single criminal transaction. She maintains the court failed to "substantiate" its conclusion that Penny presented one unified defense to the multiple acts because she had separate defenses to the state's theories that she had delayed in calling 9-1-1. She also contends the court omitted any consideration of whether there was a reasonable basis for the jury to distinguish between the acts.

**¶37** However, *Klokic* does not apply here. *Klokic* involved aggravated assault under A.R.S. § 13-1203(A), which is not a single unified offense or an alternative-means statute. 219 Ariz. 241, ¶¶ 1, 22, 196 P.3d at 845, 849; *see Jeremiah T.*, 212 Ariz. 30, ¶ 12, 126 P.3d at 181 (describing three subsections of § 13-1203(A) as "different crimes"). *Klokic* addressed those situations where the state charges "as one count separate criminal acts that occurred during the course of a single criminal undertaking even if those acts might otherwise

provide a basis for charging multiple criminal violations" and then "introduces evidence of multiple criminal acts to prove [that] single charge." *Klokic*, 219 Ariz. 241, ¶ 14, 196 P.3d at 847. In other words, the curative measures in *Klokic* are required in cases involving multiple acts. *See id.* ¶ 15.

¶**38** But multiple-acts cases are distinct from alternative-means cases. As the Washington Supreme Court has explained:

> In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.
>
> In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the state elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*State v. Kitchen*, 756 P.2d 105, 109 (Wash. 1988) (citations omitted), *abrogated on other grounds by In re Stockwell*, 316 P.3d 1007 (Wash.

2014); *see also State v. Timley*, 875 P.2d 242, 246 (Kan. 1994), *disapproved on other grounds by State v. Brooks*, 317 P.3d 54 (Kan. 2014). Generally, a case will fall into one of the two categories. *See State v. Hooker*, 21 P.3d 964, 968 (Kan. 2001) ("Our analysis of the instructions and charges leads to the conclusion that this was an alternative means case, not a multiple acts case, and, thus, no unanimity instruction was required."); *State v. Gardner*, 889 N.E.2d 995, 1005 (Ohio 2008) ("[T]he critical inquiry is whether the case involves 'alternative means' or 'multiple acts.'"); *State v. Bobenhouse*, 214 P.3d 907, 911 (Wash. 2009) ("The review standard for whether the failure to provide a unanimity instruction was error hinges on whether we are dealing with an alternative means case or a multiple acts case.") (emphasis omitted).

**¶39**        As explained above, this is an alternative-means case. Thus, Penny's reliance on *Klokic*'s multiple-acts analysis is misplaced. Simply put, unanimity instructions were not required. *See Hooker*, 21 P.3d at 968; *see also Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) ("'[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'"), *quoting McKoy v. North Carolina*, 494 U.S. 433, 449 (1990). In similar contexts, we have concluded that instructions indicating the jury need not unanimously agree on the manner in which an offense was committed were proper. *See State v. Cotten*, 228 Ariz. 105, ¶ 5, 263 P.3d 654, 657 (App. 2011); *State v. Pena*, 209 Ariz. 503, ¶¶ 11-12, 104 P.3d 873, 876 (App. 2005).

**¶40**        Penny nevertheless appears to suggest that this case involves both alternative means and multiple acts based on the state's various theories of criminal liability. The two concepts may overlap where the state charges the defendant with one offense under an alternative-means statute and then alleges multiple, distinct acts as to the separate means. *See Payne*, 233 Ariz. 484, ¶¶ 85-86, 314 P.3d at 1263 (discussing *Klokic* under § 13-3623(A)). However, even assuming this were a multiple-acts case, "'there is no reasonable basis' for distinguishing" between the acts. *Id.*, *quoting Klokic*, 219 Ariz. 241, ¶ 25, 196 P.3d at 849. Rather, we agree with the

trial court that the multiple acts alleged by the state constitute a single criminal transaction. In turn, we explain our conclusions that Penny offered "'essentially the same defense to each of the acts'" and that there was no "'reasonable basis for the jury to distinguish'" among the acts. *Klokic*, 219 Ariz. 241, ¶ 18, 196 P.3d at 848, *quoting Stankewitz,* 793 P.2d at 41.

¶41 In considering whether Penny presented the same defense to the multiple acts alleged by the state, we find *Klokic* instructive. There, the defendant presented two materially different defenses. The defendant "both denied drawing the handgun on either occasion and also, in the alternative, asserted different justifications for each time he drew the handgun." *Id.* ¶ 37. We concluded that the jury possibly could have disagreed as to which of the acts gave rise to the defendant's criminal liability, "a possibility raised by these different defenses," and the defendant was, therefore, entitled to one of the curative measures. *Id.* ¶¶ 37-38.

¶42 Here, Penny's defenses were inextricably intertwined. As the trial court noted, her defenses to the multiple acts can be distilled to a denial of liability or a claim of actual innocence. Penny maintained she did not injure Emily and offered other possibilities as to what ultimately caused her death. *See State v. Schroeder*, 167 Ariz. 47, 53, 804 P.2d 776, 782 (App. 1990) (where defense was acts of fondling did not occur, jury left with weighing credibility of defendant, and verdict implied jury rejected defense; thus, defendant not prejudiced by trial court's failure to provide unanimity instruction or require election by state). Penny's counsel argued in closing that "none of [the acts alleged by the state] happened" and that Penny "did everything [she] could to help [Emily]."

¶43 As for Penny's assertion that she presented separate defenses concerning the state's theories of delay, we disagree. Penny characterizes those separate defenses as follows: (1) "Randall's failure to volunteer information about phone calls he traded with Penny . . . cannot circumstantially imply that either defendant delayed a 911 call," (2) evidence that one of the calls was made to settle a bet shows that the calls were "of benign content,"

and (3) "absent testimony, no content whatsoever could be imputed to any call, making speculative the State's claim that Emily's distressed condition was the subject of any call except the one made right before the 911 call." But these "defenses" all are directed at showing that Penny did not delay in calling 9-1-1, which relates back to her overarching claim that she did not injure Emily.[8] It is only how that injury occurred—by a physical act, delay, or otherwise— that changed based on the state's allegations. These defenses were not separate, alternative theories. *See Klokic*, 219 Ariz. 241, ¶ 19, 196 P.3d at 848 (suggesting that defenses were same where "defendant did not offer different justifications that could have been separately believed or disbelieved"). Thus, Penny presented "essentially" the same defense to the multiple acts alleged by the state. *Id.* ¶ 18.

¶44        Turning to the next factor in the single criminal-transaction analysis, the defendant must demonstrate some reasonable basis for the jury to distinguish among the multiple acts alleged by the state. *See id.* ¶¶ 32-34, 36. On appeal, Penny contends that her role in the multiple acts alleged by the state provides a distinguishing feature: she either "personally caus[ed]" Emily's injury, "passively permitt[ed]" Emily's injury, or had "no knowledge . . . about what caused Emily's distress." But she did not present this argument below, perhaps explaining why the trial court did not explicitly address it in its ruling, as Penny complains. Indeed, the court identified the reasonable-basis factor in its ruling, suggesting that it did not entirely omit consideration of it. In any event, we decline to adopt Penny's argument on appeal. Penny has pointed us to no authority, and we are aware of none, indicating that the nature of her conduct in relation to Emily's injury is a sufficient distinguishing feature.

---

[8]In her opening brief, Penny admits she delayed calling 9-1-1 to the extent she took Emily to the bathroom and splashed her with water. She offers this as a further example of how the defenses differed. But, for the reasons stated above, the overarching defense of innocence is still the same.

¶45        The multiple acts alleged by the state in this case "only caused a single result"—Emily's death—and were part of a "single criminal undertaking." *Id.* ¶ 28. Notably, the state had to allege the multiple acts in this case because it did not know the precise timing and nature of the injury leading to Emily's death. In addition, the multiple acts "occurred over a relatively short period of time," the evening before or morning of the incident. *Schroeder*, 167 Ariz. at 53, 804 P.2d at 782. Thus, Penny failed to demonstrate a reasonable basis for distinguishing among the multiple acts.

¶46        In sum, because this is an alternative-means case, the trial court did not need to instruct the jury on unanimity or otherwise compel the state to elect the theory on which it wished to proceed. *See Klokic*, 219 Ariz. 241, ¶ 14, 196 P.3d at 847. Even if this were a multiple-acts case, no curative measures were necessary because the acts amounted to a single criminal transaction. *See id.* ¶ 15. Thus, it was sufficient that, in returning a guilty verdict, the jurors unanimously agreed Penny committed child abuse; they were not required to unanimously agree on how the offense was committed. *See Herrera,* 176 Ariz. at 16, 859 P.2d at 126; *Encinas,* 132 Ariz. at 496-97, 647 P.2d at 627-28. Consequently, the court did not err in denying Penny's motion for a new trial on this basis. *See Hoskins*, 199 Ariz. 127, ¶ 52, 14 P.3d at 1012; *Bolding*, 227 Ariz. 82, ¶ 5, 253 P.3d at 282; *see also State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984) ("We are obliged to affirm the trial court's ruling if the result was legally correct for any reason.").

## Weight of the Evidence

¶47        Penny also contends the trial court erred by denying her motion for a new trial because the verdict was against the weight of the evidence. Generally, we review a court's decision on a motion for a new trial based on the weight of the evidence for an abuse of discretion. *State v. Davis*, 226 Ariz. 97, ¶ 5, 244 P.3d 101, 103 (App. 2010). The state maintains, however, that this argument is waived because Penny did not raise the issue below and failed to argue on appeal that the error was fundamental. *See State v. Moreno-Medrano*, 218 Ariz. 349, ¶ 17, 185 P.3d 135, 140 (App. 2008).

¶48　　　In the introductory paragraph of her motion for a new trial, Penny listed the reasons requiring a new trial. Those reasons largely coincided with the language of Rule 24.1(c), Ariz. R. Crim. P., which provides the grounds upon which a new trial may be granted. The first reason listed in the motion was: "[T]he verdicts were contrary to law and the weight of the evidence." *See* Ariz. R. Crim. P. 24.1(c)(1). However, the remainder of Penny's motion did not mention the weight of the evidence. And, in her supplemental brief on the motion, that ground likewise was not discussed. It also does not appear to have been raised at oral argument on the motion.

¶49　　　A passing reference to the verdict being contrary to the weight of the evidence is not sufficient to raise this argument below. *Cf. State v. Lopez*, 217 Ariz. 433, ¶ 4, 175 P.3d 682, 683 (App. 2008) (general objection insufficient to preserve issue for appeal; objection on one ground does not preserve issue on another ground). Indeed, as Penny points out, the trial court did not address this ground in its ruling on the motion for a new trial, presumably because it did not realize it was an issue. And, because Penny does not argue that the alleged error is fundamental—and we can find none that can be so characterized—we agree with the state that the argument is waived. *See Moreno-Medrano*, 218 Ariz. 349, ¶ 17, 185 P.3d at 140. We find waiver particularly appropriate here where the Rule 24.1(c)(1) determination falls within the trial court's purview and discretion. *See State v. Clifton*, 134 Ariz. 345, 348-49, 656 P.2d 634, 637-38 (App. 1982).

## Prosecutorial Misconduct

¶50　　　Last, Penny argues the trial court erred in denying her motion for a new trial based on prosecutorial misconduct. She points to four incidents that she contends demonstrate a "pervasive and persistent course of misconduct[,] which deprived [her] of a fair trial." She maintains the prosecutor: (1) attacked the credibility of the West family by claiming they conspired to lie; (2) attacked the credibility of defense expert witnesses; (3) violated Rule 803(18), Ariz. R. Evid., by referring to irrelevant and prejudicial evidence; and (4) attacked defense counsel by suggesting they attempted to

mislead the medical examiner.[9]  We review the denial of a motion for a new trial based upon prosecutorial misconduct for an abuse of discretion.  *State v. Anaya*, 170 Ariz. 436, 441, 825 P.2d 961, 966 (App. 1991).

**¶51**　　　"To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *State v. Hughes,* 193 Ariz. 72, ¶ 26, 969 P.2d 1184, 1191 (1998), *quoting Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).  "'Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.'"  *Id.*, *quoting State v. Atwood,* 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).  However, prosecutorial misconduct is harmless if we are satisfied "beyond a reasonable doubt that it did not contribute to or affect the verdict."  *State v. Roque*, 213 Ariz. 193, ¶ 152, 141 P.3d 368, 403 (2006).

**¶52**　　　Even if an error is harmless and does not warrant reversal by itself, "an incident may nonetheless contribute to a finding of persistent and pervasive misconduct if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and 'did so with indifference, if not a specific intent, to prejudice the defendant.'"  *Id.* ¶ 155 (internal citation omitted), *quoting Hughes*, 193 Ariz. 72, ¶ 31, 969 P.2d at 1192.  Thus, after reviewing each individual incident, we must identify those constituting misconduct and evaluate their cumulative effect on the trial.  *Id.*

---

[9] Penny also summarily claims the prosecutor committed misconduct by presenting "false evidence in rebuttal regarding scientific findings made by the defense pathologists."  However, she failed to develop this argument as required by Rule 31.13(c)(1)(vi), Ariz. R. Crim. P.  It is therefore waived.  *See State v. Sanchez*, 200 Ariz. 163, ¶ 8, 24 P.3d 610, 613 (App. 2001).

¶53        In its ruling on Penny's motion for a new trial, the trial court found "no prosecutorial misconduct occurred in any of these incidents alone or in combination."   The court noted that "the prosecution may have struck hard blows in this case," but "it did not strike any foul ones in either its cross-examination of defense expert witnesses or in its summations to the jury."   And, quoting *Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271-72 (1984), the court further determined that, even if any of the incidents constituted misconduct, it "was not 'intentional conduct that the prosecutor knew was improper and prejudicial.'"   We agree.

**Attack on the West Family's Credibility**

¶54        Penny first contends the prosecutor "adopted a strategy to attempt to prove that Penny and Rand[all] . . . had coached their children to lie" by keeping K. and C. home from school on the morning of the incident so Randall could help them "fabricate a lie to cover up a crime."   She claims the prosecutor knew the girls had been at school that morning based on attendance and telephone records and statements from Randall and the girls.   She thus maintains the prosecutor "chose a strategy of subterfuge to unfairly attack the credibility of the entire West family."

¶55        Penny's argument on this point, however, contains absolutely no citations to the record. [10]   *See* Ariz. R. Crim. P. 31.13(c)(1)(vi).   We therefore cannot confirm that the prosecutor knew Randall had taken K. and C. to school that morning, as Penny alleges.   She also fails to point us to the prosecutor's alleged "subterfuge, innuendo and insinuation."   We

---

[10]Penny's attempt to incorporate by reference the arguments she made below is improper.   An opening brief may not incorporate by reference any issue or argument but, rather, must set forth specific claims, present sufficient argument supported by legal authority, and include citations to the record.   *See* Ariz. R. Crim. P. 31.13(c)(1)(vi); *State v. Dominguez*, 236 Ariz. 226, ¶ 8, 338 P.3d 966, 970 (App. 2014) ("[I]ncorporation by reference is forbidden.").

thus have no conduct to review and deem the argument waived. *See Bolton*, 182 Ariz. at 298, 896 P.2d at 838 (failure to sufficiently argue claim constitutes waiver and abandonment).

¶56 In her reply brief, Penny nevertheless directs us to the following portion of the prosecutor's closing argument:

> Now, on the same hand, when [defense counsel] suggested to you . . . how . . . in control and what a caring, concerned, and whatever father [Randall] was, you heard [what counsel] said in his opening, in his closing statement, and you heard testimony not only at trial, but in the defendant's own statements that school gets out at 1:15 on Wednesday. I would submit, why did he even take the girls to school at 11:00 that morning after such a traumatic morning? And by now, he clearly knows, because he's been talking to Penny, that this is not a minor injury.
>
> . . . .
>
> Rand[all] said—as far as whether he was concerned and caring about what had happened that morning, he admits in his own statement, when he got home, the paramedics are there, and that he didn't ask them anything. He didn't ask them what had happened. He didn't ask them how Emily was. He didn't ask them anything. That's his words in his statement to the detectives that day. He said he didn't recall whether he asked the kids anything about what had happened. Folks, I would submit to you that that's got to strike you as a little bit odd. His wife call[ed] him frantic, Emily has fallen, she

won't move, she's not moving, I don't
know if she's breathing, and she's frantic
and hysterical, and he has to rush home,
and he doesn't ask the paramedics how the
child is.  What happened?  He doesn't ask
his children what happened this morning?
He didn't go to the hospital until after 4:00
that day to be with his wife.

¶57    Even assuming Penny's argument is not waived, *see*
*State v. Oakley*, 180 Ariz. 34, 36 n.1, 881 P.2d 366, 368 n.1 (App. 1994)
(issue raised for first time in reply brief waived), we can discern no
suggestion by the prosecutor that Randall kept the girls home from
school to coach them to lie.  Rather, the prosecutor was responding
to defense counsel's claim that Randall was a "concerned, caring
father."

¶58    Moreover, it is not readily apparent to us how Randall's
conduct affected Penny's case.  Penny cites nothing to suggest that
the prosecutor argued she had encouraged or otherwise knew
Randall had kept the girls home from school in order to "fabricate a
lie."  We thus agree with the trial court that no prosecutorial
misconduct occurred as to this incident.

**Attack on Defense Expert Witnesses**

¶59    Penny contends the prosecutor "unfair[ly] attack[ed]"
three defense expert witnesses:  Dr. Joseph Scheller, Dr. John
Plunkett, and Dr. Ronald Uscinski.  We address each in turn.

1.  Dr. Scheller

¶60    As to Scheller, Penny maintains the prosecutor
"insinuated a bias" by suggesting Scheller trained criminal defense
attorneys.  She points to the following question posed by the
prosecutor during Scheller's cross-examination:  "When you've gone
and done . . . defense bar training on how to defend child abuse
cases, have you seen some of your colleagues?"  But Penny has not
directed us to where she objected to this particular question at trial

or raised this instance of alleged misconduct in her motion for a new trial. And we cannot find any such challenge in the record. We therefore deem the issue waived. *See State v. Milton*, 85 Ariz. 69, 74, 331 P.2d 846, 849 (1958) (issue waived where not objected to at trial or set forth as ground for new trial); *see also Moreno-Medrano*, 218 Ariz. 349, ¶¶ 16-17, 185 P.3d at 140 (argument forfeited for all but fundamental, prejudicial error if not raised below; argument then waived if fundamental error not argued on appeal).

### 2. Dr. Plunkett

**¶61**     As to Plunkett, Penny first contends the prosecutor created a "false impression" about the existence of more recent medical studies on determining the age of brain injuries while cross-examining him. Plunkett testified that Emily's subdural hemorrhage "pre-dated" August 17, reasoning that "[i]t takes seven to 10 to 14 days to get fibroblast growth in the dura to the extent that" Emily had. During cross-examination, the following exchange occurred:

> Q. Could [Emily's membrane] be newer?
>
> A. Pretty unlikely to be newer. It could be. But I wouldn't go . . . below five or six days, at least from the published literature on the development of membranes.
>
> Q. Now can you tell us what the published literature says about the development of membranes, does it go in stages as to how many fibroblasts you might expect to see?
>
> A. Meritt and Munro wrote an article in '36, '37, '38, on this topic, it was on adults but there is no reason to expect that kids are going to be any different. A fellow, I am blocking on his name right

now, published an article in the Archives of Pathology in 1947 or 1948 in which he described the development of iron as his primary focus of the article, and the development of a membrane as a secondary focus of the article. And so he plugged this into the Meritt and Munro chart, and that's about what you come up with.

. . . .

Q. Now, again, you have read the more recent literature? When you said '38, you are talking 1938 when these studies came out. Have you read more recent literature about the development of fibroblasts?

A. There isn't one. '47 is the most recent one I'm aware of. Well, there are a whole number of articles in Japanese written by Japanese neuro-surgeons published in the Journal of Neuro-surgery in this country. . . .

Q. You are not aware though of any more recent literature that talks about how rapidly fibroblasts will form and at what stages?

Penny asserts, "The clear insinuation from this line of questioning was that the prosecutor had recent research studies that undermined [Plunkett's] testimony regarding the fibroblast membrane." But she argues the prosecutor did not produce any such research and none exists.

¶62       We disagree that the prosecutor committed misconduct by suggesting more recent research existed. Plunkett was the first to

bring up the "published literature," and only at that point did the prosecutor ask what that literature consisted of. Based on Plunkett's response, the prosecutor asked generally if more recent research existed. And, after Plunkett referred to more recent Japanese studies, the prosecutor attempted to clarify the issue. The questions were relevant to impeach Plunkett's testimony about when Emily's brain injury likely occurred. *See State v. Burns*, 237 Ariz. 1, ¶ 104, 344 P.3d 303, 327 (2015).

¶63    Next, Penny contends the prosecutor "tried to mischaracterize the evidence in order to prejudice the jury" while questioning Plunkett about whether Emily's injury had resulted from a "violent force." Her argument is based on the following exchange:

> Q.  Your ultimate conclusion as to the cause of Emily's death was that it was, I think you said you agreed with [the county medical examiner, Dr. Eric Peters,] and that it was due to blunt impact?
>
> A.  Correct.
>
> Q.  And did you agree with Dr. Peters'[s] assessment that it was a violent force?
>
> A.  No.
>
> Q.  So you didn't agree with Dr. Peters?
>
> A.  I don't recall Dr. Peters ever using the term violent force in his report of it. Let me take a look. He doesn't use the term violent force. This child's death is due to a non-natural and violent cause. Violence is a generic term used to indicate

anything other than natural disease. He does not use the term violent force.

> Q. Unnatural and violent cause?

> A. Correct.

> Q. And you don't believe that in any way connotes the level of force it would have had to take?

> A. I certainly wouldn't use that. The connotation was there was something other than a low velocity impact.

> Q. Would you agree with me that violent cause does not equate to low velocity impact?

> A. Violence, if you look it up in the dictionary, does not have a quantitative term. Any time you strike somebody in the arm, regardless of the force that is used, that's an act of violence.

¶64 We disagree that the prosecutor mischaracterized the county medical examiner's conclusion about Emily's cause of death. Even assuming he did, we are satisfied beyond a reasonable doubt that the prosecutor's actions did not contribute to or affect the verdict. *See Roque*, 213 Ariz. 193, ¶ 152, 141 P.3d at 403. As the state points out, "[t]he prosecutor was attempting to impeach . . . Plunkett by using language from the medical examiner's report to undermine his conclusion [Emily] had not been the victim of a crime." But, because Plunkett had the medical examiner's report with him, he was able to cite directly from it and distinguish between the prosecutor's use of "violent force" and the medical examiner's use of "non-natural and violent cause." Thus, Plunkett's testimony clarified the medical examiner's conclusion, and, if his testimony had any effect on the verdict, it was in Penny's favor.

3. Dr. Uscinski

¶65 Penny also argues the prosecutor "improperly injected a false claim" into the trial while cross-examining Uscinski "by using a hypothetical that had no basis in fact." The prosecutor's question was: "So if for example hypothetically speaking if the caretaker says, I lost my cool and I shook the child violently, and you see a child with retinal hemorrhages, because you don't believe shaking can cause retinal hemorrhages you would not consider the admission the caretaker made to a paramedic about shaking the child."

¶66 However, after the prosecutor posed the hypothetical, defense counsel objected and the trial court sustained the objection. The court also instructed the jury to disregard questions to which it had sustained objections. We assume the jury follows its instructions. *See State v. Canion*, 199 Ariz. 227, ¶ 43, 16 P.3d 788, 798 (App. 2000). Thus, even if the hypothetical was improper, we are satisfied beyond a reasonable doubt that the prosecutor's conduct did not contribute to or affect the verdict. *See Roque*, 213 Ariz. 193, ¶ 152, 141 P.3d at 403.

**Violation of Rule 803(18)**

¶67 Penny next contends the prosecutor introduced hearsay evidence during the trial while questioning Scheller, Plunkett, and Dr. Patrick Barnes by reading from "articles that w[ere] not established as reliable." She argues this conduct violated Rule 803(18), Ariz. R. Evid., and constituted misconduct.

¶68 Rule 803 provides exceptions to the hearsay rule. Subsection (18) explains that a "statement contained in a treatise, periodical, or pamphlet" is not excluded by the rule against hearsay if "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination" and "the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice."

1.  Dr. Scheller

¶69        As to Scheller, Penny appears to challenge the prosecutor's citation to the American Pediatrics Journal, the Journal of Neurosurgery, the Journal of Trauma, and the Archives of Pediatric and Adolescent Medicine.  But, before reading articles from each of those journals, the prosecutor asked Scheller if the journals were "reputable," to which Scheller agreed.  He also confirmed that the latter three were "peer-reviewed."  The prosecutor thus complied with Rule 803(18).

¶70        Penny nevertheless seems to suggest that, under Rule 803(18), the individual articles, rather than the journals as a whole, need to be verified as reliable.  We disagree.  Rule 803(18) specifically provides that "the publication" must be "established as . . . reliable."  Establishing the publication—or, in this case, the journal—in which the article is printed as reliable provides sufficient "guarantees of trustworthiness" to overcome any hearsay concerns. *Rossell v. Volkswagen of Am.*, 147 Ariz. 160, 173, 709 P.2d 517, 530 (1985).

2.  Dr. Plunkett

¶71        As to Plunkett, Penny challenges the prosecutor's reference to "a great deal of literature . . . in the Journal of Pediatrics, the Journal of Neurosurgery that says . . . the most common cause for retinal hemorrhages is non-accidental inflicted trauma."  But, before Plunkett responded, defense counsel objected and the trial court sustained the objection.  As previously mentioned, the court instructed the jury to disregard such questions, and we assume the jury followed its instructions.  We are therefore satisfied beyond a reasonable doubt that this incident did not contribute to or affect the verdict. *See Roque*, 213 Ariz. 193, ¶ 152, 141 P.3d at 403.

3.  Dr. Barnes

¶72        Penny challenges the prosecutor's questioning of Barnes about a book chapter he had co-authored with Dr. Paul Kleinman. She points out that Barnes "specifically stated that the information in

that text had been updated and . . . that the textbook was no longer reliable." She thus suggests there was no verification of reliability as required by Rule 803(18). In response, the state argues that "Rule 803(18) was not implicated" because the prosecutor used the contents of the book chapter, which was inconsistent with Barnes's trial testimony, for impeachment purposes. It maintains the book chapter constituted a prior inconsistent statement, admissible under Rule 801(d)(1)(A), Ariz. R. Evid. We agree.

¶73        Rule 801(d)(1)(A) provides that a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony." This is a "broad exception to the hearsay rule" because "[i]t is based upon a belief that a jury ordinarily should be permitted to consider a prior inconsistent statement in determining credibility." *State v. Carr*, 154 Ariz. 468, 471, 743 P.2d 1386, 1389 (1987); *see also State v. Miller,* 187 Ariz. 254, 257, 928 P.2d 678, 681 (App. 1996).

¶74        Here, Barnes's testimony and opinions in this case were generally inconsistent with the cited portions of the book chapter he co-wrote. *See State v. Hines*, 130 Ariz. 68, 71, 633 P.2d 1384, 1387 (1981) (inconsistency determined by "whole impression or effect of what has been said or done"; "absolute oppositeness" not required) (citation omitted). Penny nevertheless argues that the contents of the book chapter do not qualify as prior inconsistent statements because "[Barnes] agreed that the statement[s] w[ere] no longer true." But this argument misses the point of the rule allowing prior inconsistent statements, which are typically used for impeachment as to the witness's credibility. *See Carr*, 154 Ariz. at 471, 743 P.2d at 1389. The requirements under Rule 801(d)(1)(A) were met here.

¶75        In a related argument, Penny contends the prosecutor improperly questioned Barnes about the "unknown opinions" of Kleinman, who did not testify at trial. She maintains such questioning was "collateral, irrelevant and argumentative and . . . an unfair insinuation that . . . Barnes'[s] opinion was in conflict with that of . . . Kleinman." But Penny has not supported her argument. *See* Ariz. R. Crim. P. 31.13(c)(1)(vi); *Bolton*, 182 Ariz. at 298, 896 P.2d

at 838 (failure to argue claim constitutes waiver and abandonment). We therefore do not address it further.

¶76        Penny has not shown any violation of Rule 801 or Rule 803.   Accordingly, she also has failed to meet the higher standard of showing that any error "'infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Hughes*, 193 Ariz. 72, ¶ 26, 969 P.2d at 1191, *quoting Donnelly,* 416 U.S. at 643.

**Attack on Defense Counsel**

¶77        Penny lastly contends the prosecutor unfairly attacked "the credibility of defense counsel."   According to Penny, the day before Emily's death, during a scheduled visitation with her biological family, Emily fell and hit her head on a changing table, but a witness mistakenly reported that she had hit her head on a bookshelf.   Penny claims she "had cleared the issue up prior to trial" but the prosecutor "improperly impugned defense counsel" while questioning Plunkett "by suggesting that defense counsel had misled the medical examiner regarding this prior incident."

¶78        Penny, however, has failed to provide citations to the record showing that the prosecutor in fact knew Emily had hit her head on a changing table and not a bookshelf.   Consequently, we cannot determine whether the prosecutor's question to Plunkett was knowingly improper.   We therefore deem the argument waived.   *See* Ariz. R. Crim. P. 31.13(c)(1)(vi); *Bolton*, 182 Ariz. at 298, 896 P.2d at 838.

¶79        But, even assuming the argument is not waived, we agree with the trial court that no prosecutorial misconduct occurred. Despite alleging that the prosecutor "persistently" brought this issue up, Penny directs us to only one portion of Plunkett's cross-examination.   The prosecutor showed Plunkett a letter defense counsel had written to him and asked whether he had relied on information contained in that letter in forming his opinions in this case.   Penny takes issue with the following questions:

> Q. . . . I will ask specifically as far as there was a description of some falls in this letter. And under number three of the letter, and let me ask you if you recall being . . . given information from the defense that there was a fall the day prior where Emily struck her head on a wooden book shelf?
>
> A. Well, that letter actually states that on the 24th, which was the day that Emily collapsed, so that's wrong. . . .
>
> Q. Correct. And assuming that is just a typographical error, that incident occurred on the 23rd, did you take into account whether Emily had fallen the day previous to her collapse and struck her head on a wooden book shelf?

¶80 Through this questioning, however, we can discern no attempt by the prosecutor to "impugn defense counsel." Rather, we agree with the state that "[t]he obvious thrust of this questioning was to impeach . . . Plunkett about the basis of his expert opinion, i.e. whether he had considered incomplete or inaccurate information when rendering his expert opinion." The emphasis of the questions was that Emily had fallen the day before—not what she had hit when she fell—and how that affected Plunkett's opinion. This was a proper topic for impeachment. *See Burns*, 237 Ariz. 1, ¶ 104, 344 P.3d at 327.

**Cumulative Effect**

¶81 As to all the incidents above, we have either determined that no prosecutorial misconduct occurred or, assuming there was some misconduct, it was harmless. Turning to those incidents where we assumed some misconduct, we agree with the trial court that the prosecutor did not "intentionally engage[] in improper conduct . . . 'with indifference, if not a specific intent, to prejudice [Penny].'" *Roque*, 213 Ariz. 193, ¶ 155, 141 P.3d at 403, *quoting*

36

*Hughes*, 193 Ariz. 72, ¶ 31, 969 P.2d at 1192. Thus, the cumulative effect was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Hughes*, 193 Ariz. 72, ¶ 26, 969 P.2d at 1191. And, based on the foregoing, we cannot say the court erred in denying Penny's motion for a mistrial based on prosecutorial misconduct. *See Anaya*, 170 Ariz. at 441, 825 P.2d at 966.

## Disposition

¶82 For the foregoing reasons, we affirm Penny's conviction and sentence.