NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

AVELINO GUZMAN TAMALA, *Appellant.*

No. 1 CA-CR 17-0319
FILED 11-8-2018

Appeal from the Superior Court in Maricopa County
No. CR2014-005969-002
The Honorable Warren J. Granville, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Linley Wilson
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Kevin D. Heade
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Chief Judge Samuel A. Thumma and Judge Maria Elena Cruz joined.

---

**H O W E**, Judge:

¶1        Avelino Guzman Tamala appeals his conviction and sentence for first-degree murder, claiming that (1) insufficient evidence supports his conviction, (2) the State deprived him of a unanimous jury verdict by presenting evidence of multiple acts that could have supported the conviction, (3) the trial court erred in failing to give a "multiple acts" jury instruction, and (4) the trial court erred in two evidentiary rulings. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        We view the facts in the light most favorable to upholding the verdicts and resolve all reasonable inferences against the defendant. *State v. Harm*, 236 Ariz. 402, 404 n.2 ¶ 2 (App. 2015). Between 1990 and 1995, D.S. was a detention officer with the Maricopa County Sheriff's Office ("MCSO"). At some point during 1990 or 1991, he supervised county jail inmate Anna Reyes for a few months until her release. About a year after Reyes was released, she telephoned D.S. The two met in person and commenced a sexual relationship.

¶3        A few months later, Reyes told D.S. she was pregnant but explained that she wanted "to go and be with her ex one more time so that he could think that the kid was his, and it just blew [D.S.] away." Based on Reyes's desire to "be with her ex," D.S. permanently ended his relationship with her. On November 26, 1993, Reyes gave birth in Mexico to D.S.'s daughter, C.R.

¶4        In the early 1990's, Tamala was a MCSO detective who "made quite a few big [drug] cases." According to Tamala's supervisor, "he was one of my best detectives at the time." S.C. was a confidential informant ("CI") who assisted Tamala with narcotics investigations. S.C.'s friend Reyes, also worked as a CI with Tamala and S.C. on undercover investigations beginning in July 1994 when she was released from prison.

¶5 Tamala and Reyes became romantically involved, which caused him to resign from MCSO in late January 1995. Almost six months later, the couple rented a house in Ahwatukee. Sometime in 1995, M.G. began working for Reyes as a live-in housekeeper and babysitter at the Ahwatukee home. At the time, C.R. lived with Reyes's mother in Mexico. Sometime before September 1996, however, C.R. began living with Reyes, Tamala, and Reyes's three minor children from previous marriages. A.R., Reyes's teenaged niece, also began living with Tamala and Reyes in 1996.

¶6 A.R. and M.G. described Tamala as a "step dad" to Reyes's children. After C.R. arrived at the Ahwatukee home, however, the family became "abnormal." Specifically, Reyes and Tamala treated C.R. differently from the other children. C.R. was not allowed to interact with the children or share meals with the family and was not permitted to have friends. C.R. initially slept directly on the floor in Reyes's and Tamala's bedroom and was later moved to the closet. Tamala never showed C.R. affection and was "angry[,] . . . harsh[, and] mean" in his interactions with her. Except for a family trip, A.R. never saw C.R. outside the bedroom.

¶7 A day or two after Christmas 1996, Tamala, Reyes, and the children went to Colorado for vacation. C.R. was left alone in the cabin when all the others went skiing. One day, the children were outside playing in the snow, and although everyone else was dressed appropriately for the cold weather, C.R. was wearing only "Levis and a little shirt." When C.R. eventually returned inside, she "was blue, [had] blue lips, [and] she was shaking really bad." During the car trip home, C.R. soiled herself and Tamala stopped the car and got out angrily. Reyes pulled C.R. out of the car, and when the three returned, C.R. had a fresh "little scrape on her head." When A.R. confronted Reyes about C.R.'s treatment, Reyes explained she "got raped . . . in jail . . . and [Tamala and Reyes] didn't like her." A.R. did not disclose Tamala's and Reyes's abuse of C.R. at the time because she believed Tamala was a "cop" or "special agent undercover[.]"

¶8 M.G. also observed numerous instances of Tamala and Reyes mistreating C.R. She described the following:

> After [Tamala and Reyes] cut [C.R.'s] hair,[1] she was locked
> up in a cage like a dog cage, they started locking her up. . . .
> The little girl . . . she was just in her undergarments, they

---

1 The record reflects that Tamala, with Reyes's assistance, shaved C.R.'s head, and thereafter she was "always bald."

would tell her to get in and she would get in and they would
close the little door behind her. . . . She would just cry.

M.G. further explained that C.R. had to "bend[] down" to fit in the kennel,
and Reyes would take C.R. out of the kennel when she had urinated or
defecated on herself "and bring her outside and bathe her with the hose[.]"

¶9　　　M.G. further described an incident when Tamala let C.R. out
of the cage before binding her feet and hands, laying her down on the floor,
tying her arm to a door, and stepping on her. C.R. was left "tied up . . . [a]
whole night and a day." While C.R. was bound, Tamala did not provide her
with food or water, and after finally untying her, Reyes and Tamala
returned C.R. to the kennel.

¶10　　　A day later, Tamala again removed C.R. from the kennel and
took her to the bathroom where M.G. "could hear . . . the water was on
really strong. You could hear the little girl yelling, screaming and he told
her that she was going to do what he wanted." After Tamala returned C.R.
to the kennel, M.G. never observed her out of the kennel again. M.G.
described C.R.'s appearance as "sad, very, very, very thin. She was skin and
bones, . . . her skin was right up against her bone." M.G. explained that C.R.
"would just whine . . . in the kennel[.] She didn't even have enough breath
to keep crying. She would just whine, and really slowly[,] . . . [and] that's
all you could hear." While in the kennel, C.R. was not fed, and when M.G.
attempted to feed C.R., Reyes commanded her to stop. At some point, C.R.
stopped defecating. C.R. was confined in the kennel for two to three weeks.

¶11　　　In April 1997, around the time C.R. was kept in the kennel,
M.G. and her boyfriend were victims of a drive-by shooting as they
returned home from a nightclub. M.G. was seriously wounded and her
boyfriend was killed.

¶12　　　After recuperating, M.G. returned to work for Reyes in May.
C.R. was no longer at the house, and M.G. never saw C.R. again.
Approximately one month later, M.G. quit. Shortly thereafter, Tamala told
M.G., "[W]atch out for [Reyes], because the accident [you] had hadn't been
quite an accident[.]" Out of fear that Tamala was a police officer, M.G. did
not report C.R.'s abuse.

¶13　　　Tamala and Reyes moved out of the Ahwatukee house in June
1998. Tamala later married I.G. and admitted to her that he "helped bury a
little girl in the desert" after keeping her in a kennel and "barely [feeding]
her[.]" Tamala also admitted to S.C. that he and Reyes put C.R. in a "cage"

before the girl was killed and that her body was "somewhere in the desert." Smirking, Tamala then said, "[I]f there's no body, there's no crime."

¶14        In November 1998, S.C. told Detective Brent Coombs that C.R. had possibly died and that Reyes was her mother. Detective Mike Meislish began investigating and obtained a sample of Reyes's blood. An agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives interviewed Reyes in August 1999 about C.R.'s disappearance. Referring to C.R. as "it," Reyes explained the last time she saw C.R. was in Mexico where she claimed that C.R. was staying with Reyes's mother.

¶15        In late November 1999, a hunter found a partial human skull in a desert south of Phoenix and contacted police. Deputy Keith Moore responded, located the skull along with other bone fragments, and delivered the items to the medical examiner's office.

¶16        DNA testing of Reyes's blood sample and the skull fragments in 2000 indicated that Reyes could not be excluded as the mother of the person whose remains were found in the desert. No other leads developed, however, and the investigation went cold.

¶17        After initially denying that she had observed C.R.'s abuse when detectives visited her in 2013, M.G. contacted police a year later and reported the abuse that she had witnessed. Tests conducted at the Arizona Department of Public Safety crime lab in 2014 developed a DNA profile of the bone fragments. Based on DNA samples collected from Reyes and D.S., the skull fragments were determined to belong to C.R.

¶18        In 2016, a forensic anthropologist identified injuries to the skull fragment that indicated blunt force trauma occurred while C.R. was alive or shortly after her death. Although a forensic pathologist could not determine C.R.'s precise cause of death, he could not exclude skull fractures, severe brain swelling, malnutrition, or other kinds of abuse.

¶19        Alleging both accomplice and direct liability, the State charged Tamala with one count of first-degree murder.[2] The State based the charge on alternative theories of premeditation or felony murder with child abuse being the predicate offense. Before trial, Tamala moved to dismiss the first-degree murder charge as duplicitous; alternatively, he requested that the State elect which act constituted the predicate offense of child

---

[2]        At the time of Tamala's trial, Reyes had not been located.

abuse. The trial court denied Tamala's requests. Tamala's main defense at trial was that Reyes alone murdered C.R.

¶20 Tamala moved to cross-examine M.G. about her citizenship status and her "U-Visa" application.[3] M.G., a Mexican national, arrived in the United States with a tourist visa in 1997. M.G.'s 2012 application for a U-Visa was based on her status as a victim in the drive-by shooting incident—not her status as a witness for the State in this case. Tamala agreed at trial that the materials M.G. prepared in connection with her U-Visa application contained no reference to this case. Further, M.G. specifically informed the court that she was not promised "anything for information in order to get the [U-Visa.]" She also explained she did not believe she would be more likely to obtain the visa based on her testimony in this case. The court concluded that M.G.'s attempt to obtain a U-Visa did not affect her testimony and denied the motion.

¶21 After a prolonged discussion between the parties and the court about Reyes's comments to law enforcement officers in 1999 and their admissibility under Arizona Rule of Evidence 801(d)(2)(E), the co-conspirator exception to the rule against hearsay, the parties ultimately agreed the State could introduce Reyes's explanation that she did not know C.R.'s whereabouts because C.R. was with Reyes's mother.

¶22 After the State rested its case in chief, Tamala requested a multiple-acts instruction, listing the distinct acts of child abuse and requiring the jurors to unanimously agree which act—starvation, blunt-force trauma, or dehydration—caused C.R.'s death. The court declined the instruction.

---

[3]     In its answering brief, the State describes a U-Visa as follows:

> A "U Visa" is a nonimmigrant visa that may be given to an alien who has "suffered substantial physical or mental abuse as a result of having been a victim of [qualifying] criminal activity" that occurred in the United States; who possesses information about that criminal activity; and who "has been helpful, is being helpful, or is likely to be helpful" to law enforcement or the prosecuting government agency, in connection with investigating or prosecuting the criminal activity. 8 U.S.C. § 1101(a)(15)(U).

¶23          The jury returned a guilty verdict with five jurors finding felony murder only and seven jurors finding both premeditation and felony murder. The court imposed a prison term of natural life. With the court's permission, Tamala filed a delayed notice of appeal.

## DISCUSSION

### 1. Sufficiency of Evidence

¶24          Tamala challenges the sufficiency of the evidence supporting his felony-murder conviction, arguing no evidence establishes that he caused C.R.'s death by abusing her. We review claims of insufficient evidence de novo. *State v. West*, 226 Ariz. 559, 562 ¶ 15 (2011).

¶25          Sufficient evidence may be direct or circumstantial and "'is such proof that reasonable persons could accept as adequate'" to "'support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Borquez*, 232 Ariz. 484, 487 ¶¶ 9, 11 (App. 2013) (quoting *State v. Mathers*, 165 Ariz. 64, 67 (1990)). "To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo*, 155 Ariz. 314, 316 (1987). In evaluating the sufficiency of the evidence, we test the evidence "against the statutorily required elements of the offense," *State v. Pena*, 209 Ariz. 503, 505 ¶ 8 (App. 2005), and "'do not reweigh the evidence to decide if we would reach the same conclusions as the trier of fact,'" *Borquez*, 232 Ariz. at 487 ¶ 9 (quoting *State v. Barger*, 167 Ariz. 563, 568 (App. 1990)). Witness credibility is an issue for the jury at trial, not this Court on appeal. *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996).

¶26          As applicable here, a person commits felony murder if, "[a]cting either alone or with one or more other persons the person commits or attempts to commit . . . child abuse under § 13–3623, subsection A, paragraph 1 . . . and, in the course of and in furtherance of the offense . . . , the person or another person causes the death of any person." A.R.S. § 13–1105(A)(2). Child abuse occurs when:

> Under circumstances likely to produce death or serious physical injury, any person . . . [intentionally or knowingly] causes a child . . . to suffer physical injury or, having the care or custody of a child . . . , who causes or permits the person or health of the child . . . to be injured or who causes or permits a child . . . to be placed in a situation where the person or health of the child . . . is endangered[.]

A.R.S. § 13–3623(A).

¶27 Despite Tamala's argument to the contrary, sufficient direct and circumstantial evidence establishes that he personally abused C.R.—and allowed Reyes to abuse C.R.—in such a manner that C.R. died from the abuse. As noted, Tamala was considered a father figure in the Ahwatukee household. The evidence establishes that Tamala, both alone and with Reyes, physically abused C.R. and confined her in a small dog kennel for two to three weeks without food or water. As a result of this abuse, C.R. became weak and emaciated to such an extent that her bodily functions were severely compromised. Although the precise cause of C.R.'s death is unknown, the evidence at trial was more than adequate to allow the jury to conclude that she died from abuse. Additionally, Tamala's admission that he buried C.R.'s body to conceal evidence of her death and his threatening statement to M.G. after she was shot—and after her boyfriend was shot and killed—strongly implicate him as being either personally responsible for killing C.R., or at very least involved with Reyes's killing of C.R.

¶28 The two cases Tamala relies upon to support his sufficiency of the evidence argument are distinguishable. In both cases, although the court concluded on appeal that evidence was insufficient to support felony-murder convictions, neither defendant made incriminating statements like Tamala did that were consistent with testimony by other witnesses. *See State v. Bennett*, 213 Ariz. 562, 567 ¶ 24 (2006) (noting only evidence presented to show defendant failed to promptly seek medical treatment for her son was the treating physician who speculated that the victim "may or may not have benefited from earlier medical treatment"); *see also State v. Johnson*, 215 Ariz. 28, 33 ¶¶ 20–22 (App. 2007) (noting the only witness who could contradict defendant's exculpatory trial testimony instead supported her testimony). Because the trial evidence was sufficient to show that Tamala caused C.R.'s death by abusing her, his sufficiency of the evidence argument fails.

## 2. Duplicitous Charge and Multiple-Acts Jury Instruction

¶29 Tamala argues that the trial court erred in allowing the State to present evidence of numerous acts of child abuse, and because the court did not require the jurors to unanimously decide which act constituted the offense, the verdict could have been non-unanimous. Reviewing for an abuse of discretion, we conclude the court did not err. *See State v. Bolton*, 182 Ariz. 290, 309 (1995) (within trial court's discretion to refuse jury instruction); *see also State v. West*, 238 Ariz. 482, 488 ¶ 12 (App. 2015) (denial of motion for new trial based on purported duplicitous charge generally reviewed for abuse of discretion).

¶30        A duplicitous charge exists "[w]hen the text of an indictment refers only to one criminal act, but multiple alleged criminal acts are introduced to prove the charge[.]" *State v. Klokic,* 219 Ariz. 241, 244 ¶ 12 (App. 2008). If a defendant is convicted of a duplicitous charge, the jury may not have unanimously decided which act constituted the offense. *State v. Davis*, 206 Ariz. 377, 390 ¶ 59 (2003). Such a verdict violates Article 2, Section 23, of the Arizona Constitution. *Id.* at ¶ 64.

¶31        The statute proscribing child abuse, A.R.S. § 13–3623(A), is an alternative-means statute. *West*, 238 Ariz. at 489 ¶ 19. The statute identifies a single crime and provides more than one means of committing the crime. *Id.* Furthermore, as the trial court correctly found, Tamala's defense to the various means of abuse—that Reyes alone was responsible—would not change had C.R. died from starvation, blunt-force trauma, or dehydration. Additionally, no reasonable basis existed to distinguish between the abusive acts because any combination of starvation, blunt-force trauma, or dehydration could have resulted in C.R.'s death. As a result, the numerous acts of child abuse constituted a continuous course of criminal conduct. *Cf. Klokic*, 219 Ariz. at 248 ¶ 32 ("[W]hen both events occur as part of a larger criminal episode, acts may not be considered part of the same criminal transaction if the defendant offers different defenses to each act or there is otherwise a reasonable basis for distinguishing between them.").

¶32        For these reasons, Tamala's argument on appeal fails. Although Tamala was entitled to a unanimous verdict on whether he committed child abuse, he was not entitled to unanimity regarding the precise manner in which the crime was committed. *See West*, 238 Ariz. at 492 ¶ 30. Accordingly, the State was not required to choose between starvation, blunt-force trauma, or dehydration as its theory of child abuse, and an unanimity instruction was not required. *Id.* at 496 ¶ 46. The trial court, therefore, properly denied both Tamala's motion to dismiss and his request for a multiple-acts jury instruction. *See Klokic*, 219 Ariz. at 244 ¶ 15 ("[I]t is not error for the trial court to fail to require such curative measures in those instances in which all the separate acts that the State intends to introduce into evidence are part of a single criminal transaction.").

### 3. M.G.'s Immigration Status

¶33        Tamala contends that he was denied his rights to present a defense and to confront M.G. with evidence of her motive to provide false testimony. We generally review a trial court's ruling on the admissibility of evidence for a clear abuse of discretion. *State v. King*, 213 Ariz. 632, 636 ¶ 15

(App. 2006). However, we review de novo challenges to admissibility based on the Confrontation Clause. *Id.*

**¶34** The Confrontation Clause of the Sixth Amendment protects a defendant's ability to prove a witness's motive or bias. U.S. Const. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974). The Confrontation Clause, however, does not prevent a trial judge from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness; courts retain wide latitude to impose reasonable limits on cross-examination based on, among other things, prejudice, confusion of the issues, and interrogation that is only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

**¶35** On this record, the trial court properly could conclude that the probative value of cross-examination about the unrelated circumstances of M.G.'s visa application and her citizenship status would be substantially outweighed by a danger of confusing the issues and misleading the jury. *See* Ariz. R. Evid. 403. Accordingly, the court did not abuse its discretion in precluding Tamala from inquiring into such matters, and his confrontation rights were not violated. *See State v. Dickens*, 187 Ariz. 1, 14 (1996) ("Although a defendant has a fundamental constitutional right to confront witnesses and present a defense, the right is limited to the presentation of matters admissible under ordinary evidentiary rules . . . ."), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 243 ¶ 20 (2012).[4]

### 4. Reyes's Statements

**¶36** Tamala challenges the admissibility of Reyes's statements to law enforcement. Tamala expressly informed the trial court that he did not object to the statements, however. Tamala therefore invited whatever error occurred, if any, and this Court need not address the issue. *See State v. Pandeli*, 215 Ariz. 514, 528 ¶ 50 (2007) (holding defendant invited error regarding admission of other act evidence when the trial court asked defense counsel if he objected to the evidence and counsel responded he did not); *see also State v. Logan*, 200 Ariz. 564, 565–66 ¶ 9 (2001) (declining to address an issue raised as a result of invited error).

---

[4] In his brief, Tamala refers to inconsistencies in M.G.'s testimony and her "newly formed memories of this case." The trial court, however, specifically informed Tamala that M.G.'s prior inconsistent statements were not precluded.

## CONCLUSION

¶37     For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA