IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SANDRA R., SERGIO C., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.R., F.M., J.M., *Appellees*.

No. 1 CA-JV 18-0147
FILED 1-29-2019

Appeal from the Superior Court in Maricopa County
No. JD20586
JS19097
The Honorable Alison Bachus, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Sandra R.*

Law Office of H. Clark Jones LLC, Mesa
By H. Clark Jones
*Counsel for Appellant Sergio C.*

Arizona Attorney General's Office, Tucson
By Autumn L. Spritzer
*Counsel for Appellee Department of Child Safety*

---

## OPINION

Judge Paul J. McMurdie delivered the opinion of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

**¶1**        Sandra R. ("Mother") appeals the termination of her parental rights to her three children: M.R., born in 2008; F.M., born in 2015; and J.M., born in 2017. Sergio C. ("Father") appeals the termination of his rights to their two children in common, F.M. and J.M.[1] We affirm the termination orders and hold: (1) the court committed harmless error by allowing the Department of Child Safety ("DCS") to introduce statements from scientific articles without meeting the foundation requirements of Arizona Rule of Evidence 803(18); (2) sufficient evidence supports the abuse finding related to the shaken-baby injury (nonaccidental trauma) even though the evidence did not prove which parent abused the child; and (3) under *Alma S. v. DCS*, 245 Ariz. 146 (2018), the "constitutional nexus" requirement established by *Linda V. v. ADES*, 211 Ariz. 76 (App. 2005), is considered under the totality of the circumstances in determining whether termination is in the best interests of the child.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        In 2013, Mother and her five-year-old daughter M.R. began living with Father. Mother subsequently gave birth to F.M. and J.M. In April 2017, six-week-old J.M. slept most of the day and vomited "a lot" that evening. Mother noticed that J.M.'s arms began shaking at various times. Assuming it was a stomach issue, Father went to the store to buy tea for J.M. Meanwhile, J.M.'s condition worsened. J.M. turned pale, started moaning, could not fully open her eyes, and her arms became stiff. After Father returned from the store, Mother and Father took J.M. to an urgent-care center where they waited more than 40 minutes for the doctor to evaluate her. Upon examination, the doctor told Mother and Father to immediately take J.M. to Phoenix Children's Hospital ("PCH").

---

[1]        M.R.'s father's parental rights were terminated in the same proceeding. He is not a party to this appeal.

¶3        At PCH, a scan revealed that J.M had a large subdural hemorrhage on the left side of her brain and a smaller subdural hemorrhage on the right. She also had damage to her optic nerve and severe retinal hemorrhaging in both eyes. The hemorrhaging caused her brain to shift out of position and compress her brainstem. Because J.M.'s life was in danger, doctors had to perform emergency neurosurgery. After surgery, Dr. Melissa Jones, a pediatrician with a specialty in child abuse pediatrics, evaluated J.M. After ruling out possible medical causes, Dr. Jones determined the injuries resulted from abusive head trauma and Mother and Father provided no alternative explanation for the cause of J.M.'s injuries. PCH reported the injuries, and DCS took custody of all three children and filed dependency petitions. The juvenile court later established the case plan as severance and adoption.

¶4        In July 2017, DCS petitioned to terminate Mother's rights to J.M., F.M., and M.R., and Father's rights to J.M. and F.M., under the abuse ground. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B). Over seven months, DCS offered Mother and Father services, including hair-follicle testing to rule out drug abuse, psychological evaluations, individual counseling, and a parent aide during visits with the children. Although Mother and Father participated in services, in discussions with counselors, they continued to minimize J.M.'s severe injuries and provided no further explanation for how the injury occurred.

¶5        The juvenile court held a three-day termination hearing. Dr. Jones testified for DCS, opining that J.M.'s injuries resulted from nonaccidental trauma. Dr. Ruth Bristol, J.M.'s pediatric neurosurgeon, testified on the manner and extent of J.M.'s injuries. Mother and Father's expert, Dr. Joseph Scheller, a pediatric neurologist with specialties in pediatric neurology and neuroimaging, opined that J.M.'s injuries most likely resulted from an unusual complication of a birth injury. The court took the matter under advisement and later issued an order terminating Mother's rights to J.M., F.M., and M.R., and Father's rights to J.M. and F.M. Mother and Father timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶6        To terminate a parent-child relationship, the court must find at least one statutory ground for termination under A.R.S. § 8-533(B) by clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). The court must also find termination is in the child's best interests

by a preponderance of the evidence. *Id.* We review the court's termination determination for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Mary Lou C. v. ADES*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *ADES v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

## A. The Court Committed Harmless Error by Allowing DCS to Cross-Examine Mother and Father's Expert Witness with Publications in His Field Without Laying Proper Foundation.

¶7        Mother and Father assert that DCS failed to lay proper foundation for the scientific articles it used to impeach Mother's and Father's expert witness, Dr. Scheller. Although we agree the court erred by not requiring DCS to lay the proper foundation for the publications, we conclude the error was harmless. *See Monica C. v. ADES*, 211 Ariz. 89, 94, ¶ 22 (App. 2005) (harmless error applies in juvenile proceedings).

¶8        This court will affirm the juvenile court's evidentiary rulings "absent a clear abuse of its discretion and resulting prejudice." *Lashonda M. v. ADES*, 210 Ariz. 77, 82–83, ¶ 19 (App. 2005). Abuse of discretion occurs when a court's decision is "manifestly unreasonable" or based on "untenable" grounds. *Id.* (quoting *Quigley v. City Court of Tucson*, 132 Ariz. 35, 37 (1982)).

¶9        Arizona Rule of Evidence 803(18) governs the admission of hearsay statements from learned treatises, periodicals, or pamphlets. Rule 803(18) provides that statements from such publications may be read into evidence, but not received as an exhibit, if:

> (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and

> (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

"The learned treatise exception to the hearsay rule stems from [the] . . . independent guarantees of trustworthiness of such works." *Rossell v. Volkswagen of Am.*, 147 Ariz. 160, 173 (1985). By requiring the proponent to elicit an expert's recognition of the publication's reliability, Rule 803(18)(B) provides the proper method to verify the statement's

trustworthiness. *See State v. West*, 238 Ariz. 482, 500–501, ¶¶ 68, 70 (App. 2015).

¶10　　　　Mother and Father argue DCS failed to lay the proper foundation before recounting statements from the scientific articles in the following two instances:

> [DCS Counsel:]　　Okay. In Jones' study, he concluded, again, that these are rare, but cannot be diagnosed unless nonaccidental head injury had been questioned thoroughly, do you agree with that statement?
>
> [Dr. Scheller:]　　Yes and no. It's sort of -- it's a very complicated statement that he said. And I'm happy to explain why or I'll just say --
>
> 　　　　*　　　*　　　*
>
> [DCS Counsel:]　　And you're familiar with the Feldman study that was published in September of 2001?
>
> [Dr. Scheller:]　　Yes, 2001. Because he's published a real lot of studies.
>
> 　　　　*　　　*　　　*
>
> [DCS Counsel:]　　And [Feldman's] study found chronic or mixed chronic and acute subdural hematoma were found only in abused children in his study, that's what he found, correct?
>
> [Dr. Scheller:]　　Yes.

Mother timely objected to each line of questioning, citing DCS's failure to establish that the publications containing the articles were reliable as required by Rule 803(18)(B). The court overruled each objection and found Dr. Scheller's knowledge of the studies provided adequate foundation to question him about the contents.

¶11　　　　DCS asserts it was not obligated to follow Rule 803(18)'s foundation requirements during the cross-examination because it "did not

seek to admit the articles into evidence." We reject this argument. By asking Dr. Scheller to confirm its paraphrased descriptions of the articles' findings, DCS put the truth of the findings themselves at issue. *See* Ariz. R. Evid. 801(c) (hearsay means an out-of-court statement offered to prove the truth of the matter asserted in the statement); Ariz. R. Evid. 802 (hearsay generally inadmissible); *West*, 238 Ariz. at 501, ¶ 71 (superior court properly sustained objection to prosecutor's reference to the findings of a "great deal of literature" in scientific journals); *Sharman v. Skaggs Cos.*, 124 Ariz. 165, 168–69 (App. 1979) (discussion of a report's findings on cross-examination introduced hearsay statements from report). Thus, before recounting the articles' findings, DCS was required to first lay proper foundation concerning the reliability of the publications in which those articles appeared, or the reliability of the studies within the articles. DCS did not lay the required foundation, and the court erred by overruling Mother's and Father's objections to DCS's improper cross-examination.

¶12 Although the court should have required DCS to establish the publications' reliability before receiving evidence of the articles' findings, we nonetheless conclude that the error was harmless. Dr. Scheller conceded his familiarity with each authority, was able to answer DCS's follow-up questions, and at times challenged DCS's attempts to restrict his explanations of the articles' findings. While Mother and Father take issue with whether the referenced publications were current and credible, their respective counsel did not develop these arguments on redirect examination despite the opportunity to do so. And although the juvenile court ultimately rejected Dr. Scheller's opinion, it based that decision on the testimony of J.M.'s treating physicians and Dr. Scheller's concessions surrounding the cause of J.M.'s injuries, not whether Dr. Scheller's opinion was contrary to the weight of published authority.

## B. Sufficient Evidence Supports the Court's Order Terminating Mother's and Father's Rights Based on Abuse or Failure to Protect from Abuse.

¶13 Mother and Father argue insufficient evidence supports the court's termination order under the abuse ground. A.R.S. § 8-533(B)(2) provides:

> B. Evidence sufficient to justify the termination of the parent-child relationship shall include . . .

*     *     *

2.      [t]hat the parent has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child.

If a parent abuses or neglects their child, the court may terminate that parent's rights to their other children on this basis, even if there is no evidence that the other children were abused. *Linda V.*, 211 Ariz. at 79, ¶ 14.

**¶14**      Reasonable evidence supports the court's finding that J.M.'s injuries were caused by abuse. While in Mother and Father's exclusive care, J.M. suffered a large subdural hemorrhage on the left side of her brain and a smaller subdural hemorrhage on the right. She also had significant midline shift and herniation of her brain, meaning there was so much pressure in the brain that it started to shift out of its normal position. J.M. required emergency neurosurgery to relieve the pressure because it had become so great that her skull could no longer contain the brain and its contents without threatening her life. She also had diffused retinal hemorrhages (or bleeding) in all quadrants of the retina and all layers of the retina. Her head injuries negatively affected a multitude of systems in her body. Post-trauma, doctors diagnosed her with cerebral palsy because she had significant motor impairment. She also suffers from regular epileptic seizures and is blind. She now requires occupational therapy, feeding therapy, and 24-hour monitoring. Dr. Bristol testified that J.M. will likely require long-term, full-time care for the foreseeable future.

**¶15**      At the termination hearing, Dr. Jones opined that J.M.'s injuries occurred within a few days before her hospital admission and resulted from nonaccidental trauma. After reviewing the family's medical history and J.M.'s birth records, Dr. Jones found no alternative medical explanation for her injuries. Similarly, Dr. Bristol testified that J.M.'s injuries were most likely caused by recent trauma. Dr. Jones added that J.M.'s lack of external injuries did not rule out abuse.

**¶16**      Dr. Scheller disagreed and testified that J.M.'s injuries resulted from a subdural hematoma at birth that began spontaneously re-bleeding some weeks later, which in turn caused her retinal hemorrhages. Dr. Scheller conceded that this occurrence would be "an unusual complication" and that no other non-traumatic medical condition could have caused J.M.'s injuries.

¶17 Dr. Jones and Dr. Bristol opined on Dr. Scheller's conclusion, testifying that such an occurrence under the circumstances present with J.M. would be "very, very rare." Dr. Jones testified that "children [who] have spontaneous re-bleeding [also] have some other complicating factor with their brain." Dr. Bristol testified that in her experience as a pediatric neurosurgeon she had "not seen a spontaneous re-bleed to that degree." Dr. Jones opined that J.M.'s presentation and injuries did not correspond to Dr. Scheller's theory, particularly the diffuse nature of J.M.'s retinal hemorrhages, which was consistent with "massive trauma with acceleration and deceleration." Regarding J.M.'s eye injuries, Dr. Jones stated that:

> [T]here had to be [a] significant force that led to that pattern of retinal hemorrhages. You can get retinal hemorrhages from many different causes, but the only times we see [J.M.'s] pattern of retinal hemorrhages in the pediatric population is from abusive head trauma, severe motor vehicle collisions or there's some case reports of children who have fallen out of two or three story windows onto concrete.

Dr. Jones specifically distinguished Dr. Scheller's theory, testifying that "when the pressure is high in the brain, you can get retinal hemorrhages," but they are typically "in the . . . most recessed part of the retina . . . surrounding the optic nerve," which was "not the same pattern that [J.M.] had."

¶18 Throughout the investigation, dependency, and termination hearings, Mother and Father maintained that J.M. had suffered no accidents or injuries that would explain her injuries. At J.M.'s first health checkup (a few weeks before her traumatic brain injury), the doctor examining J.M. noted no concerns. Likewise, Mother and Father maintained that J.M. only began showing symptoms the evening they took her to the hospital. In sum, reasonable evidence supports the juvenile court's determination that J.M.'s injuries were the result of nonaccidental trauma.

¶19 Based on its conclusion that J.M.'s injuries were the result of nonaccidental trauma, the court also found that Mother or Father, or both, intentionally abused J.M. or knew or reasonably should have known that the other parent abused her, "as she was in their sole care when she suffered life-threatening injuries." The court also found that, despite the "timing, extent, mechanics and presentation of [J.M.'s] injuries," Mother and Father continued to deny that abusive conduct occurred, presented a "united front," and remained committed to each other and their relationship. And

because neither parent had "shown a willingness to leave the other to protect the children from the other parent," the court concluded that "both parents have demonstrated their lack of protective capacities for all of the children, not only [J.M.]."

¶20      Mother and Father have consistently maintained that they were J.M.'s only caregivers since her birth. Mother and Father continuously denied J.M. was abused, even after they were confronted with PCH's medical assessments of J.M.'s injuries. Despite strong evidence that at least one of them caused J.M.'s injuries, Mother and Father made no attempt to distance themselves from one another. To the contrary, in the months following the incident with J.M., Mother and Father deepened their commitment to one another by marrying. Given this record, reasonable evidence supports the juvenile court's determination that: (1) one or both parents willfully abused J.M. by causing J.M.'s physical injuries; and (2) one or both parents failed to protect J.M. after they knew or reasonably should have known J.M. had been abused. *See Maricopa County Juv. Action Nos. JS-4118/JD-529*, 134 Ariz. 407, 408–09 (App. 1982) (where mother refused to obtain a divorce or otherwise separate herself from husband who had committed abuse, her "knowing failure" to protect her children from abuse by her husband justified termination of her parental rights); *see also Mario G. v. ADES*, 227 Ariz. 282, 287–88, ¶¶ 19–25 (App. 2011) (finding a father's failure to protect one child from abuse justified termination of his rights to another child); *Linda V.*, 211 Ariz. at 79, ¶ 14 (parents "who permit another person to abuse or neglect their children" may have their parental rights terminated). Once DCS established Mother and Father abused or failed to take steps to protect J.M. after the abuse occurred, the statutory grounds to terminate Mother's and Father's rights to the other children were also met. A.R.S. § 8-533(B)(2); *Linda V.*, 211 Ariz. at 79, ¶ 14. Accordingly, reasonable evidence supports the court's finding that termination of Mother's rights to J.M., F.M., and M.R., and Father's rights to J.M. and F.M., was justified under A.R.S. § 8-533(B)(2).

### C.    *Alma S. v. DCS* **Requires Courts to Consider the Connection Between the Prior Abuse of One Child and the Risk of Future Abuse to the Other Children During the Best-Interests Inquiry.**

¶21      Mother and Father argue insufficient evidence supports the juvenile court's finding that there was a "nexus" between the abuse of J.M. and the risk of abuse to F.M. and M.R. In the past, this court has expressly held that termination of parental rights to a child who has not been the direct target of abuse requires the party seeking termination of rights to show, at the statutory-grounds stage, "a constitutional nexus between the

prior abuse and the risk of future abuse to the child at issue." *Seth M. v. Arienne M.*, 245 Ariz. 245, 248, ¶ 11 (App. 2018) (quoting *Tina T. v. DCS*, 236 Ariz. 295, 299, ¶ 17 (App. 2014)); *Mario G.*, 227 Ariz. at 285, ¶ 16. This court recently revisited the constitutional nexus requirement, noting that it "first appeared in a footnote in the *Linda V.* opinion, although that opinion does not identify any legal source for such a requirement and it is not present in the statute itself." *Seth M.*, 245 Ariz. at 248, ¶ 11 (citing *Linda V.*, 211 Ariz. at 80, ¶ 17, n.3).

¶22    The uncertainty expressed in *Seth M.* towards requiring this showing at the statutory-grounds stage was realized when our supreme court issued its decision in *Alma S. v. DCS*. In *Alma S.*, the supreme court held "the substantive grounds for termination listed in § 8-533(B) [are synonymous] with parental unfitness," and once the juvenile court finds a parent to be unfit, the best-interests analysis is triggered. 245 Ariz. at 150–51, ¶¶ 9, 12. *Alma S.* thus makes clear that, at the statutory-grounds stage, the juvenile court should *only* determine whether the party seeking termination has met its burden of proving a parent unfit under one of the grounds for termination. *See Alma S.*, 245 Ariz. at 154, ¶ 32–33 (Bolick, J., concurring in the result) ("However, the Court today holds that all that must be proven by clear and convincing evidence is that the parent engaged in one of the statutory grounds for termination, which by itself 'constitute[s] a finding of parental fitness.'" (alteration in original) (quoting *id.* at 150, ¶ 11)). Considerations outside the scope of A.R.S. § 8-533(B)(2)—such as whether a connection exists between a parent's abuse of one of their children and the risk of abuse to their other children—are left to the best-interests inquiry. This conclusion not only comports with *Alma S.*'s discussion of the two-step termination inquiry, but also *Linda V.*'s original application of a "nexus" requirement. *See Linda V.*, 211 Ariz. at 80, ¶ 17, n.3 (addressing the need to demonstrate a nexus between prior abuse and the risk of future abuse in the court's best-interests analysis).

**D.    Reasonable Evidence Supports the Court's Finding that Termination of Mother's and Father's Parental Rights Served the Children's Best Interests.**

¶23    Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K.*, 210 Ariz. at 286, ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the

continuation of the relationship." *Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) (emphasis omitted). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S.*, 245 Ariz. at 148, ¶ 1. In cases where termination of a parent's rights to one child is predicated on the parent's abuse of another child, courts must also consider the connection between that abuse and the risk of future abuse to the child at issue. *See Seth M.*, 245 Ariz. at 248, ¶ 11; *Mario G.*, 227 Ariz. at 285, ¶ 16; *Linda V.*, 211 Ariz. at 79–80 ¶¶ 14–15, 17. "When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016). Finally, "[t]he existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. DCS*, 240 Ariz. 96, 98, ¶ 12 (App. 2016).

¶24 Here, based on its finding that Mother or Father abused J.M. or that they failed to protect J.M. from abuse, the juvenile court found that it had "grave concerns about the parents' protective capacities in the future." Mother and Father argue that the risk of abuse to F.M. and M.R. is remote because J.M. was a vulnerable infant, unlike the older children. But the juvenile court rejected this argument and concluded that by failing to take steps to protect J.M. from the unidentified abusing parent, "Mother and Father have demonstrated they cannot or will not protect their children." The court specifically found that:

> Although [M.R. and F.M.] are no longer infants, [they] are young children who are vulnerable. [M.R.] has already been the victim of child abuse by Mother in the past.[2] Mother and Father . . . have not been forthcoming about the cause of [J.M.'s] injuries.

---

2    In 2011, while Mother went shopping, she left M.R., who was two years old at the time, unsupervised inside her car for 40 minutes. The temperature outside was 106 degrees. A police officer removed M.R. from the car before she suffered any serious injury, but Mother was arrested and subsequently pled guilty to child abuse.

The court also found that "given the parents' persistent denials that any abuse occurred," both J.M. and her older siblings remained at risk of future abuse.

¶25    Reasonable evidence in the record supports these findings. M.R. was nine years old at the time of the termination hearing and F.M. was almost three—both still dependent on Mother and Father to meet their needs. Both parents' actions after learning the nature of J.M.'s injuries demonstrated they could not recognize danger and keep the children safe. As J.M.'s primary caregivers, Mother and Father are the only ones in a position to explain how her injuries occurred. Mother and Father have refused to acknowledge abuse occurred or that at least one of them was responsible. Instead, they have remained together, and neither parent has taken steps to prevent the children from being returned to the same situation that led to J.M.'s near-fatal injuries. On this record, we conclude reasonable evidence supports the court's finding that the abuse to J.M. bore a substantial connection to the risk of future abuse to the other children in Mother's and Father's care.

¶26    Moreover, reasonable evidence concerning the children's adoptability supports the juvenile court's best-interests finding. The case manager testified that F.M. and M.R. were in a kinship placement that was meeting their needs and the foster parents wished to adopt them. Due to J.M.'s special needs, she was in a separate placement for a medically-fragile child that was providing her the specialized care she required. Although J.M.'s placement was not willing to adopt, DCS identified other potential adoptive placements for her. Considering the children's stability in their current placements, and the availability of adoptive placements, the case manager testified that termination would provide the children with "a safe, secure environment, where all of their needs will be met." Reasonable evidence supports the court's finding that termination was also in the children's best interests because of their adoptability.

## CONCLUSION

¶27    For the foregoing reasons, we affirm the juvenile court's order terminating Mother's rights to J.M., F.M., and M.R. and Father's rights to J.M. and F.M.