IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

SANDRA R., SERGIO C.,
*Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.R., F.M., J.M.,
*Appellees*.

No.  CV-19-0057-PR
March 11, 2020

Appeal from the Superior Court in Maricopa County
The Honorable Alison Bachus, Judge
Nos.  JD20586; JS19097
**AFFIRMED**

Opinion of the Court of Appeals, Division One
246 Ariz. 180 (App. 2019)
**VACATED IN PART**

COUNSEL:

John L. Popilek, John L. Popilek P.C., Scottsdale, Attorney for Sandra R.

H. Clark Jones (argued), Law Office of H. Clark Jones LLC, Mesa, Attorney for Sergio C.

Mark Brnovich, Arizona Attorney General, Brunn (Beau) W. Roysden III, Division Chief Counsel, Appeals and Constitutional Litigation Division, Drew C. Ensign, Section Chief, Civil Appeals, Phoenix, Autumn L. Spritzer,

Dawn Rachelle Williams (argued), Assistant Attorneys General, Tucson, Attorneys for Department of Child Safety

Kristina Reeves, April Maxwell, Gillespie Shields Goldfarb & Taylor, Phoenix, Attorneys for Amici Curiae Gillespie Shields Goldfarb & Taylor

———————

JUSTICE LOPEZ authored the opinion of the Court, in which VICE CHIEF JUSTICE TIMMER, and JUSTICES GOULD and MONTGOMERY joined. JUSTICE BOLICK concurred in the result.[*]

———————

JUSTICE LOPEZ, opinion of the Court:

¶1 We consider the inquiry a juvenile court must make when terminating parental rights under A.R.S. § 8-533(B)(2) — a parent's neglect or willful abuse of a child — as to the parent's children who were not neglected or abused. We conclude that when a juvenile court finds a parent unfit for neglecting or willfully abusing a child, the court may also find the parent unfit as to that parent's non-abused children.[1] In order to do so, the court must determine, during the initial statutory unfitness inquiry, whether there is clear and convincing evidence of a risk of harm to the children at issue.

**I.**

¶2 Sandra R. ("Mother") and her five-year-old daughter M.R. began living with Sergio C. ("Father") in 2013. Mother subsequently gave birth to Father's children, F.M., in 2015 and J.M., in 2017. On April 24, 2017, then six-week-old J.M. slept most of the day and began vomiting that evening. Later that night, her condition worsened. J.M.'s arms began to shake, she turned pale, started moaning, could not fully open her eyes, and her arms became stiff. Mother and Father took J.M. to an urgent-care center where, upon examination, the doctor told them to immediately take J.M. to

———————

[*] Chief Justice Robert Brutinel and Justice James P. Beene have recused themselves from this matter.

[1] For the sake of brevity, we refer to children who show no evidence of neglect or abuse as "non-abused" children.

Phoenix Children's Hospital ("PCH"). At PCH, a scan revealed that J.M. had a large subdural hemorrhage on the left side of her brain and a smaller subdural hemorrhage on the right side and severe retinal hemorrhaging. She also had a significant midline shift and herniation of her brain. J.M. required emergency neurosurgery to alleviate life-threatening pressure in her brain. J.M. had no external injuries such as bruising, abrasions, or lacerations, but her head injuries negatively affected a multitude of systems in her body. Post-trauma, PCH doctors diagnosed her with cerebral palsy. She now suffers from regular epileptic seizures, is blind, and requires occupational therapy, feeding therapy, and 24-hour monitoring.

¶3            Dr. Melissa Jones, a PCH pediatrician with a specialty in child abuse pediatrics, evaluated J.M post-surgery. After reviewing the family's medical history and J.M.'s birth records, Dr. Jones determined J.M.'s injuries resulted from abusive head trauma. Mother and Father provided no alternative explanation for the cause of J.M.'s injuries. PCH reported the injuries and, as a result, the Arizona Department of Child Safety ("DCS") took custody and filed dependency petitions as to all three children. In July 2017, DCS moved to terminate Mother's rights to J.M., F.M., and M.R., and Father's rights to J.M. and F.M., for parental abuse or failure to protect from abuse. *See* § 8-533(B)(2). M.R.'s father's parental rights have been terminated, and he is not a party to this appeal.

¶4            Over seven months, DCS offered Mother and Father services, including hair-follicle testing to rule out drug abuse, psychological evaluations, individual counseling, and a parent-aide during visits with the children. Mother and Father participated in services but continued to minimize J.M.'s injuries and provided no further explanation for how the injuries occurred.

¶5            The juvenile court held a four-day termination hearing in December 2017 and April 2018. Dr. Jones testified for DCS, stating she believed that J.M.'s injuries resulted from nonaccidental trauma and that J.M.'s lack of external injuries did not rule out abuse. According to Dr. Jones, the retinal hemorrhaging was indicative of "massive trauma" caused by acceleration and deceleration with "significant force." Dr. Ruth Bristol, the pediatric neurosurgeon who performed the emergency surgery, testified that J.M.'s injuries were most likely caused by recent trauma and that J.M. would require long-term, full-time care for the foreseeable future.

**¶6**        Mother and Father's expert, pediatric neurologist Dr. Joseph Scheller, disagreed with DCS's experts.  He testified that a scalp injury caused J.M.'s retinal hemorrhages at birth resulting in a subdural hematoma that began spontaneously re-bleeding some weeks later.  He conceded that this occurrence would be "an unusual complication" and that no other non-traumatic medical condition could have caused J.M.'s injuries.

**¶7**        Dr. Jones and Dr. Bristol rejected Dr. Scheller's conclusion. Dr. Jones testified that such an occurrence under J.M.'s circumstances would be "very, very rare" and that "children [who] have spontaneous re-bleeding [also] have some other complicating factor with their brain."  Dr. Bristol testified that the blood clot was only one or two days old and had not been present since birth.  She further testified that in her experience as a pediatric neurosurgeon, she had "not seen a spontaneous re-bleed to that degree."  Dr. Jones stated that the only time PCH sees J.M.'s pattern of retinal hemorrhages is from abusive head trauma, severe motor vehicle collisions, or children who have fallen out of two- or three-story windows onto concrete.

**¶8**        On April 23, 2018, the juvenile court terminated Mother's rights to J.M., F.M., and M.R., and Father's rights to J.M. and F.M.  The court found that J.M.'s injuries were the result of nonaccidental trauma and that Mother or Father, or both, intentionally abused J.M. or knew or reasonably should have known that the other parent abused her "as she was in their sole care when she suffered life-threatening injuries."  Applying the "constitutional nexus" standard established by *Linda V. v. Arizona Department of Economic Security*, 211 Ariz. 76 (App. 2005), the juvenile court found a significant nexus existed between J.M.'s abuse and the risk of abuse to J.M.'s siblings.  The court found that despite J.M.'s extensive injuries, Mother and Father continued to deny that abusive conduct occurred, presented a "united front," and remained committed to each other and their relationship, even marrying.  Because neither parent had shown a willingness to leave the other to protect the children from the other parent, the court concluded that both parents demonstrated their lack of protective capacities for all the children.

**¶9**        Mother and Father appealed, arguing that the court did not find a sufficient "constitutional nexus" between J.M.'s abuse and risk of

abuse to F.M. and M.R.[2]  The court of appeals affirmed, holding that sufficient evidence supported the abuse finding.  *Sandra R. v. Dep't of Child Safety*, 246 Ariz. 180, 184–85 ¶ 14 (App. 2019).  The court concluded that reasonable evidence supported the juvenile court's determination that one or both parents willfully abused J.M., and one or both parents failed to protect J.M. after they knew or reasonably should have known that J.M. was abused.  *Id.* at 186 ¶ 20.  The court further held that once DCS established Mother and Father abused or failed to take steps to protect J.M. after the abuse occurred, it also satisfied the statutory grounds to terminate Mother and Father's rights to their other children.  *Id.* (citing § 8-533(B)(2); *Linda V.*, 211 Ariz. at 79 ¶ 14).

**¶10**        In reaching its decision, the court concluded that our opinion in *Alma S. v. Department of Child Safety*, 245 Ariz. 146 (2018), requires courts to analyze the "constitutional nexus" standard under the totality of the circumstances in determining whether termination is in the best interests of the child rather than during the initial parental unfitness inquiry.  *Sandra R.*, 246 Ariz. at 186–87 ¶ 22.  The court then determined that reasonable evidence supported the juvenile court's best-interests analysis, noting the evidence of J.M.'s abuse and the juvenile court's finding of a significant nexus between J.M.'s abuse and the risk of abuse to J.M.'s siblings.  *Id.* at 187 ¶¶ 23–24.

**¶11**        We granted review to clarify the appropriate inquiry under § 8-533(B)(2), a recurring issue of statewide importance.  We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

**¶12**        Section 8-533 lists the statutory bases to terminate a parent's right to the care, custody, and control of a child.  "We have interpreted § 8-533(B) as entailing a two-step inquiry."  *Alma S.*, 245 Ariz. at 149 ¶ 8.  The juvenile court must first find that a statutory ground for termination exists by clear and convincing evidence.  *Id.*  Next, the court must determine by a preponderance of the evidence that severance is in the child's best interests.  *Id.* at 149–50 ¶ 8.  In *Alma S.*, we reiterated that the substantive grounds for

---

[2] Mother and Father also appealed the termination of their parental rights to J.M., but that issue is not before us.

termination enumerated in § 8-533(B) are equated with parental unfitness, which ensures compliance with the due process requirement that a court find parental unfitness using a clear and convincing evidence standard. *Id.* at 150 ¶ 9 (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982)).

**¶13**		A parent may be deemed unfit under § 8-533(B)(2) when the court finds that "the parent has neglected or willfully abused a child," including "situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." The statute's plain language does not require a showing that the parent neglected or abused each child at issue in the proceeding. Thus, our court of appeals has held that if a parent neglects or abuses a child, the court may terminate that parent's rights to their other children on this basis, even if there is no evidence that the other children were harmed. *See Linda V.*, 211 Ariz. at 79 ¶ 14 (making this finding "based on the statutory language and context" of § 8-533(B)(2)).

**¶14**		*Linda V.* was the first case to hold that in order to support a parental termination on this basis, there must be a "constitutional nexus" between the neglect or abuse committed on "a child" and the risk that such neglect or abuse will occur to the child at issue in the proceeding. *Id.* at 80 ¶ 17 n.3. Although the court established the "constitutional nexus" requirement, it did not analyze how it was met in that case. Rather, the court concluded—in a footnote—that "the constitutional requirement of showing a nexus . . . was established." *Id.*

**¶15**		Since *Linda V.*, several court of appeals decisions have adopted and expanded the "constitutional nexus" standard. *See Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 299–300 ¶ 18 (App. 2014) (finding sufficient constitutional nexus between mother's willful abuse of her two children and risk of abuse to a child born after previous severance); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 285–86 ¶ 16 (App. 2011) (extending constitutional nexus to children not yet born when previous abuse occurred); *but see Seth M. v. Arienne M.*, 245 Ariz. 245, 248 ¶ 11 (App. 2018) (noting that *Linda V.* "does not identify any legal source for such a requirement and it is not present in the statute itself," but declining to address the validity of the "constitutional nexus" requirement). Although *Linda V.* did not state when the court should consider the nexus requirement during the two-step inquiry, until this case, the cases adopting the standard considered it during the initial statutory unfitness inquiry.

*See, e.g.*, *Mario G.*, 227 Ariz. at 287–88 ¶¶ 22–25 (considering the constitutional nexus requirement during the statutory unfitness inquiry before proceeding to the best-interests analysis); *Tina T.*, 236 Ariz. at 299 ¶ 18 (same).

**III.**

**¶16** We consider here whether a juvenile court, when determining whether to terminate parental rights under § 8-533(B)(2) to non-abused children, should consider this "constitutional nexus"—more accurately characterized as risk of harm to such children—during the initial statutory unfitness inquiry or the best-interests inquiry. The court of appeals held that such risk of harm should be considered under a totality of the circumstances analysis during the best-interests inquiry. *Sandra R.*, 246 Ariz. at 186–87 ¶ 22. We disagree.

**¶17** As an initial matter, we note that the "constitutional nexus" terminology, which is not in the statute, has engendered confusion in the courts. *See, e.g., Seth M.*, 245 Ariz. at 248 ¶ 11. Thus, to allay confusion, we disavow use of the "constitutional nexus" phraseology. Instead, we clarify the due process requirement embodied in the "constitutional nexus" concept: to terminate parental rights to children who exhibit no evidence of neglect or abuse, under § 8-533(B)(2), the juvenile court must find during the parental unfitness inquiry, by clear and convincing evidence, that there is a risk of harm to those children.

**¶18** Here, the juvenile court, following previous court of appeals decisions, analyzed the risk of harm to the non-abused children based on Mother and Father's alleged abuse of J.M. during the initial statutory unfitness inquiry. After finding Mother and Father unfit as to J.M. under § 8-533(B)(2), the court found a "significant nexus" between J.M.'s abuse and the risk of abuse to her siblings and expressed "grave concerns about the parents' protective capacities in the future." The court then proceeded to the best-interests analysis, finding that severing Mother and Father's parental rights would benefit all the children because they require a safe home in which their caregivers will protect them from abuse.

**¶19** The court of appeals, however, reasoned that *Alma S.* "makes clear that, at the statutory-[unfitness] grounds stage, the juvenile court should *only* determine whether the party seeking termination has met its

burden of proving a parent unfit under one of the grounds for termination." *Sandra R.*, 246 Ariz. at 186 ¶ 22. Based on this interpretation, the court found that *Alma S.* requires that "[c]onsiderations outside the scope of A.R.S. § 8-533(B)(2)—such as whether a connection exists between a parent's abuse of one of their children and the risk of abuse to their other children—are left to the best-interests inquiry." *Id.* at 187 ¶ 22. The court reasoned that its approach comports with *Alma S.*'s discussion of the two-step severance inquiry and *Linda V.*'s original application of the "nexus" requirement. *Id.*

**¶20** Although the court of appeals correctly affirmed the juvenile court's severance of parental rights as to F.M. and M.R., *infra* ¶¶ 28–32, it misconstrued this Court's holding in *Alma S.* and misinterpreted § 8-533(B)(2).

**¶21** First, the court of appeals erred by relying on *Alma S.* for the proposition that a juvenile court should consider the risk of harm to a non–abused child during the best-interests inquiry. *Alma S.* does not address this issue. Instead, it simply reiterates that the "substantive grounds for termination listed in § 8-533(B)" are equated with parental unfitness. *See Alma S.*, 245 Ariz. at 150 ¶ 9. We granted review in *Alma S.* to "clarify the appropriate inquiry for a best-interests analysis under § 8-533(B)" and, in our analysis of this discrete issue, we observed that "once the court finds 'that a parent is unfit [under § 8-533(B)], the focus shifts to the interests of the child as distinct from those of the parent.'" *Id.* at 149 ¶ 7, 150 ¶ 12 (quoting *Kent K. v. Bobby M.*, 210 Ariz. 279, 285 ¶ 31 (2005)). Thus, *Alma S.* does not support, much less require, relegation of the necessary finding that the child at issue is at risk for abuse or neglect to the best-interests inquiry.

**¶22** Second, the court improperly held that determining the risk for abuse or neglect of a non–abused child is "outside the scope" of § 8-533(B)(2). In doing so, the court's analysis effectively allows the juvenile court to terminate parental rights in significant part by establishing unfitness by a preponderance standard in the best-interests inquiry, thus violating *Santosky*'s due process requirement that parental rights may be terminated only by establishing parental unfitness by clear and convincing evidence. *See Santosky*, 455 U.S. at 769 (finding that a clear and convincing evidence standard "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process"). Thus, because due process requires that the risk of harm to the non-abused children under § 8-533(B)(2) be established by clear and

convincing evidence, *infra* ¶¶ 23–25, the determination necessarily falls within the initial statutory parental unfitness inquiry.

**IV.**

**¶23**　　　　We next consider the application of § 8-533(B)(2)'s extrapolation of parental unfitness if the neglect or abuse of a child inherently places the non-abused children at risk of harm. *See Linda V.*, 211 Ariz. at 79 ¶ 14 (finding statutory language and purpose allows courts to sever parents' rights to children who were not abused or neglected). Although we affirm that § 8-533(B)(2) permits an extrapolation of parental unfitness, we note that this extrapolation is circumscribed by constitutional considerations.

**¶24**　　　　Any extrapolation of unfitness must pass constitutional muster under *Santosky*. In other words, as with any parental rights termination, *Santosky* requires a finding of parental unfitness as to a child by at least clear and convincing evidence. 455 U.S. at 769–70 ("[D]etermination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts."). Inherent in this requirement is a demonstrable connection between the ground for termination and the harm or risk of harm to a child. *Id.* at 767 ("The State's interest in finding the child an alternative permanent home arises only when it is *clear* that the natural parent cannot or will not provide a normal family home for the child." (citation omitted) (internal quotation marks omitted)). Thus, a juvenile court may terminate a parent's rights to non-abused children under § 8-533(B)(2) only if the extrapolation of unfitness—the risk of harm to such children—is proven by clear and convincing evidence. No application of the statute may circumvent this fundamental constitutional requirement.

**¶25**　　　　Here, although the parties dispute whether the legislature intended § 8-533(B)(2) to require proof of a connection between abuse of a child and the risk of harm as a prerequisite to terminating parental rights to a non-abused child, we conclude it did. First, our legislature and courts have long recognized the constitutional mandate that grounds for termination must be proven by clear and convincing evidence. *See, e.g.*, A.R.S. § 8-537(B) ("The court's findings with respect to grounds for termination shall be based upon clear and convincing evidence . . . ."); *Kent K.*, 210 Ariz. at 283 ¶ 16 (noting that § 8-537 "requires clear and convincing

evidence only 'with respect to grounds for termination'"). Second, reading § 8-533(B)(2) in the context of the entire statute, the legislature intended to require the petitioning party to show, and the juvenile court to explicitly find, that a parent's neglect or abuse of any child demonstrates that the parent is similarly unfit to parent the child at issue. *See, e.g.*, A.R.S. § 1-601(B) (demonstrating a focus on the child at issue by providing that "[t]his state . . . shall not infringe on these [parental] rights without demonstrating that the compelling governmental interest *as applied to the child involved* is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means" (emphasis added)); A.R.S. § 8-533(B)(10) (illustrating the need to focus on the risk to the child at issue when the parent's rights to another child had been severed within the two preceding years). It would be illogical to jettison § 8-533's singular focus on the child at issue only in the context of § 8-533(B)(2). Third, the legislative history of § 8-533(B)(2) further exhibits the legislature's awareness of these constitutional standards. *See Hearing on H.B. 2255 Before the S. Comm. on Appropriations*, 43d Leg., 1st Reg. Sess. 19–20 (Ariz. 1997) (statements of Sen. Rios, Member, S. Comm. on Appropriations & Christine Powell, Chief Counsel, Ariz. Att'y Gen.) (noting that the burden of proof on the state and the "requirements to prove a severance" will prevent misuse of § 8-533(B)(2)). Finally, although we will not rewrite a statute or interpret it inconsistent with its text simply to conform it to constitutional standards, if possible, we will construe it to avoid rendering it unconstitutional. *See Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272–73 (1994).

**¶26** The State argues that parents' due process rights may be preserved by applying the clear and convincing standard to the risk of harm finding in the best-interests inquiry. Although this approach would satisfy *Santosky*'s due process requirements, it is procedurally inconsistent with our two-step inquiry under § 8-533(B), *Alma S.*, 245 Ariz. at 149–50 ¶ 8, and it unnecessarily risks conflation of the two separate inquiries and standards. *See Kent K.*, 210 Ariz. at 283 ¶ 16. Thus, courts should determine whether there is clear and convincing evidence that previous abuse of a child supports a finding of risk of harm to non-abused children under the initial statutory unfitness inquiry rather than the best-interests analysis.

**¶27** In sum, a juvenile court's extrapolation of parental unfitness will not pass constitutional muster under *Santosky* unless the risk of harm to non-abused children is proven by clear and convincing evidence. Consequently, a juvenile court is encouraged to make express findings

concerning the risk of harm to non-abused children. For example, although the record may implicitly support a juvenile court's termination order where a parent's proven neglect or abuse of a young child readily demonstrates a comparable risk to the parent's other vulnerable young non-abused children, proof of that neglect or abuse may present a close call as to whether it is constitutionally sufficient to demonstrate that the parent is unfit to parent a teenager. A juvenile court's express findings and reasoning concerning extrapolated unfitness will aid review of a parental rights termination order to ensure it meets due process requirements.

## V.

¶28　　　Mother and Father argue that the juvenile court's termination order is constitutionally infirm because the record does not establish J.M.'s abuse presents a risk of harm to her siblings sufficient to justify termination of parental rights to F.M. and M.R. "[W]e accept the juvenile court's findings of fact if reasonable evidence and inferences support them, and will affirm a severance order unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3 ¶ 9 (2016).

¶29　　　The juvenile court's findings were sufficient to support termination of Mother and Father's parental rights as to F.M. and M.R. The juvenile court found that the only plausible explanation for J.M.'s injuries was abuse because Mother and Father were her only caregivers, they denied that J.M. was dropped or any other accidental trauma occurred, and J.M.'s injuries were consistent with abuse. The court found that Mother and Father were not forthcoming about the cause of J.M.'s injuries and that, just as their denials about J.M.'s abuse were not credible, Mother and Father's "testimony that they would not harm their other children lacked credibility." The court reasoned that each parent either abused J.M., knew that J.M. had been abused, or reasonably should have known that the other parent abused J.M. due to the "timing, extent, mechanics, and presentation of her injuries."

¶30　　　The court further noted that Mother and Father remained committed to one another to the exclusion of the children, and thus the court had "grave concerns about the parents' protective capabilities in the future" as to all their children. The court concluded that the extent and degree of J.M.'s injuries, along with Mother and Father's unwillingness to protect the children from future abuse, established a severe risk of abuse to

11

F.M. and M.R.  The court rejected Mother and Father's argument that the risk of abuse to F.M. and M.R. was remote, noting they were also young and vulnerable to abuse.

¶31            Although the juvenile court did not make explicit factual findings concerning the risk of abuse to F.M. and M.R., the court sufficiently imputed the risk of harm to the other children based on J.M.'s serious injuries and Mother and Father's lack of credibility in their assurances that they would insulate their other children from abuse.  On this record, the juvenile court was not required to make detailed express findings concerning the risk of abuse to F.M. and M.R. because such risk was manifest in light of the nature of J.M.'s injuries and the other children's vulnerability due to age.

¶32            As for the best-interests analysis, reasonable evidence supported the court's finding that the severance of parental rights will benefit the children because they require a home environment free of a heightened risk of abuse.  Further, F.M. and M.R. are currently in adoptable home placements.

## VI.

¶33            We affirm the juvenile court's severance order and vacate the court of appeals' opinion in part.  We do not disturb the court of appeals' opinion as to J.M.

BOLICK, J., concurred in the result.

¶**34**        I agree with the Court's reasoning and conclusion.  I write separately only to reiterate the concerns I raised in *Alma S. v. Department of Child Safety* that some of the statutes and rules governing the termination of parental rights, and this Court's decisions interpreting and applying them, do not provide sufficient protection of the parents' rights under the United States Constitution.  245 Ariz. 146, 152–56 ¶¶ 24–39 (2018).